**LADD PETROLEUM CORPORATION, Appellant,**

v.

**EAGLE OIL AND GAS COMPANY, Ruth Loggins, Willie Loggins, Bernice Geer, Evelyn Self, Mary Hart, Donald Fulks, Mildred Parker, James Shuler, Doug Hargis, and Melvyn Blair, as Temporary Administrator of the Estate of Zeolah Blair, Deceased, Appellees.**

No. 2–84–064–CV.

Court of Appeals of Texas, Fort Worth.

Aug. 7, 1985.

Cantey, Hanger, Gooch, Munn & Collins and H. Carter Burdette, G. Dennis Sheehan and Mark Creighton, Fort Worth, for appellant.

Cowles & Thompson, Jim E. Cowles and Mark A. Stinnett, Dallas, William K. Altman, P.C. and William K. Altman, Wichita Falls, for appellees.

Before FENDER, C.J., and Burdock, J.

## OPINION

FENDER, Chief Justice.

This is an appeal from a trespass to try title action arising out of a lessor-lessee dispute in the context of an oil and gas lease case. The underlying issue is under what circumstances a pooling unit terminates. The trial court, based on the jury's answers to special issues, held that the unit terminated, and that as a result, so had certain leasehold interests held by Ladd Petroleum Corporation (hereinafter Ladd). Ladd raises some forty-five points of error.

We reverse and render in part and remand in part.

In the 1940's and 1950's various leases were written covering two adjoining tracts in Parker County, Texas, known as the Blair tract and the Woody tract. In particular, two leases were written covering the Blair tract, one in 1950 (the Fulks lease) and one in 1955 (the Blair lease). Although the relationship between these two leases is not entirely clear from the record before us, it is sufficient to say that on April 26, 1976 (a critical date, as will become clear), the following nine individuals were the legal successors in title to the interests of the lessors of the two Blair tract leases:

| | |
|---|---|
| Zeolah Blair | 2/5 undivided interest |
| Ruth and Willie | 1/5 undivided interest |
| Ruth and Willie Loggins | 1/5 undivided interest |
| Mildred Parker | 1/20 undivided interest |
| Bernice Geer | 1/20 undivided interest |
| Donald Fulks | 1/20 undivided interest |
| Evelyn Self | 1/20 undivided interest |
| James Shuler | 1/10 non-participating royalty interest |
| Mary Hart | 1/10 non-participating royalty interest |

Unless otherwise indicated, this group will be known as the Blair lessors.

The habendum clause of the Fulks lease provided for a primary term of ten years and as long thereafter as "oil, gas or other mineral is produced whether or not in paying quantities from said land hereunder, or land with which it or any part may be pooled." The habendum clause of the Blair lease provided for a primary term of five years and as long thereafter as "oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder." Both leases also authorized the lessee, at its option, to pool and unitize the leased premises with "other land, lease or leases."

In 1958, the then lessee of the Fulks and Blair leases, and the lessee of a lease covering the Woody tract, entered into an agreement called an "Identification and Description of Pooled Acreage." In pertinent part that agreement stated:

KINGWOOD OIL COMPANY, an Oklahoma corporation duly authorized to do business in Texas, and JAMES F. BREUIL, owners and holders of all the oil and gas leases hereinafter mentioned, hereby declare that the lease acreage hereinafter expressly designated is hereby pooled into a tract or unit for the production of gas and gas condensate from the Bend Conglomerate formation, only, underlying said lands.

The designated land was comprised of the Blair tract (85 acres) and the Woody tract (265 acres).

Although it is not exactly clear how or when it came about, Ladd subsequently succeeded to the leasehold interests of both the Fulks and Blair leases, and to the leasehold interests of the Woody leases on the Woody tract. Once all these interests were acquired by Ladd, the 1958 pooling agreement was transformed, in a sense, into an agreement between Ladd and itself, as it was the lessee on both the Blair tract and the Woody tract.

When the primary terms of the Fulks and Blair leases expired in 1960, there was no production from any well on the Blair tract. However, there was production from the Blair-Woody # A–1 well (a unit well) located on the Woody tract. It was production from that unit well which kept the Fulks and Blair leases alive after 1960. As provided for in the two leases, the Blair lessors, or their predecessors in interest, received royalties from the Blair-Woody # A–1 production based on the proportion that their contributed acreage to the unit bore to the total acreage of the unit.

From 1958 until April 1976 the Blair-Woody unit functioned without incident.

On April 26, 1976, Ladd filed of record in Parker County a document entitled "Release of Oil and Gas Leases." Through this document Ladd released all right, title and interest in and to its oil and gas leasehold interests on the Woody tract. Ladd claimed at trial that it had filed this release by mistake.

There was no immediate reaction by any party to the filing of the release. In fact, it appears that none of the parties (including Ladd) were aware of the release until the fall of 1977, more than a year after the

filing. In September, 1977, an attorney for Scott Woody, one of the lessors on the Woody tract, wrote a letter to Ladd demanding that Ladd drill additional wells on the Woody tract to counter possible drainage from adjacent wells. The letter made no mention of the release. It was in response to this letter that Ladd apparently became aware that it had filed a release of its leasehold interests on the Woody tract. Negotiations were then held between Scott Woody and Ladd, and a new lease was finalized by December, 1977. The new lease gave Scott Woody some powers he did not have under the prior lease. Ladd also gave Scott Woody $15,000 as a bonus payment.

During these negotiations with Scott Woody, Ladd made no effort to notify the Blair lessors and explain the situation. Ladd officials testified at trial that they felt they had no duty to inform the Blair lessors of a filing of a release affecting Scott Woody.

It is not clear when the Blair lessors first learned of the release. In October, 1978, an attorney for Zeolah Blair wrote a letter to Ladd advising the company that his client was aware of the release and asserting that the lease on the Blair tract is terminated as a result. A demand was made that Ladd release its leases on the Blair tract.

Ladd's corporate counsel responded a few weeks later. In pertinent part, the letter stated:

> Be advised that approximately three years ago Ladd inadvertently released several leases in the subject area. Immediately thereafter, Ladd renewed the leases which it had previously released. During this period of time, wells located on the subject unit and in which Mrs. Blair owns a small royalty interest continued to produce. For your further information, additional development drilling is currently occurring on this unit.

The October 3, 1978, letter from Zeolah's attorney to Ladd was the only letter he wrote to Ladd on behalf of Zeolah. Although there was some subsequent discussion between Zeolah, Zeolah's son Melvyn, and the attorney concerning the lease, no further action was taken by the attorney.

The record shows that in April and May, 1979, there were various communications between James Shuler (owner of a non-participating royalty interest on the Blair tract) and Ladd and between Melvyn Blair and Ladd. In general, these communications centered around a discussion of the Blair tract and whether Ladd would drill wells on the Blair tract.

In May, 1979, Ladd started drilling the Blair # 1 well on the Blair tract. This well was locate within sight of Zeolah Blair's home. While drilling the Blair # 1 well Ladd caused surface damage to the Blair tract. As compensation for these damages Ladd paid Zeolah Blair $1,800.

It was during the 1979 summer that two other main parties became involved in the situation: Doug Hargis and Eagle Oil and Gas Company. As early as the spring of 1979, Doug Hargis, who was involved in the business of acquiring and selling oil and gas leases, was in contact with James Shuler concerning the possibility of obtaining a lease on the Blair tract. Through discussions with James Shuler and other Blair lessors, including Zeolah Blair, Hargis obtained leases covering the Blair tract from all the Blair lessors on August 16, 1979. These leases were in conflict with Ladd's leasehold interests on the Blair tract.

On September 28, 1979, Hargis entered into a letter agreement with Eagle Oil and Gas Company through which Hargis sold his leasehold interest to Eagle. The agreement provided that Eagle would pay Hargis in four installments, on November 15, 1979, January 15, 1980, March 15, 1980 and May 15, 1980.

During the fall of 1979 Eagle asserted, through letters and other communications to Ladd, that it was the rightful owner of the Blair leasehold estate. In January, 1980, Ladd rejected Eagle's claim.

In addition to securing a new lease from Scott Woody in December, 1977, Ladd also

secured new leases, during 1978, from the other lessors on the Woody tract (they were corporations). Furthermore, Ladd completed a new pooling agreement unitizing the Fulks and Blair leases on the Blair tract with the three new leases on the Woody tract. This pooling agreement became effective in June, 1979 and included more wells and formations than did the 1958 pooling agreement.

In regards to the payment of royalties to the individual Blair lessors based on unit production from the Blair-Woody #A-1 well, the documentary evidence shows that some of the lessors cashed their checks while others did not. In particular, the record shows that Zeolah Blair did not cash any checks from October, 1978, to June, 1979, and that after June, 1979, she resumed cashing royalty checks.

It should also be noted that during a few months in the fall of 1979, Ladd refused to tender royalty checks to the Blair lessors, based on the production covered by the new pooling agreement, because the Blair lessors had refused to sign division orders acknowledging their interests under the June, 1979 pooling agreement. In January, 1980, Ladd changed its position and began mailing the royalty checks. The appellees suggest that payments to the lessors were purposely resumed to create an estoppel argument to be used against the Blair lessors. Appellees note that the resumption of payments occurred at about the same time that Ladd finally rejected Eagle's claim.

In July, 1980, the appellees, (Eagle, the individual Blair lessors and Hargis) brought a trespass to try title action against Ladd, Scott Woody and the other Woody lessors. Two years later appellees filed an amended petition. In pertinent part, the petition stated:

### III.

On August 16, 1979, and at all times relevant to this Petition, Plaintiff Eagle, Plaintiffs Blair, and Plaintiff Hargis were and now are the owners in fee simple and are entitled to the possession of the oil, gas and minerals in and under the following described property located in Parker County, Texas, and hereinafter referred to as the "Blair Tract: ...

. . . . .

### V.

On or about August 16, 1979, Plaintiffs were, and still are, legally entitled to possession of the oil, gas and minerals in and under the Blair tract. Plaintiffs Blair have been legally entitled to possession of said property since April 26, 1976. On or after August 16, 1979, Defendant Ladd wrongfully and unlawfully entered upon the subject property and dispossessed Plaintiffs of such premises, and continues to withhold possession from the Plaintiffs.

. . . . .

### VIII.

Since April, 1976, and particularly since August 16, 1979, Defendants have asserted, and are still asserting, unfounded claims of title to the subject property, and have trespassed upon Plaintiffs' property, thereby casting clouds upon PLaintiffs' titles and interfering with the exercise by Plaintiffs of acts of dominion over said property, ...

Appellees asked for the following kinds of damages: (1) value of minerals produced by Ladd on the Blair tract from the Blair #1 well; (2) value of minerals lost to drainage from adjoining tracts (on the theory that Ladd prevented appellees from drilling offset wells); (3) exemplary damages for Ladd's bad faith; and (4) alternately, the Blair lessors asked for damages for Ladd's breach of its duty to operate as a prudent operator and failure to drill offset wells.

The case went to trial in November, 1983, and two main theories were advanced by the appellees: (1) the Fulks and Blair leases terminated, as a matter of law, because of the filing of the April 26, 1976 release, and, alternatively, (2) the Fulks and Blair leases terminated because production from Blair-Woody #A-1 became noncommercial. At this point, a threshold

question arises. Ladd objected at trial and argues on appeal that the second theory relied upon by appellees—noncommercial production—was not properly pled. Ladd contends that appellees' pleadings must be construed as alleging only a special theory of recovery based upon the consequences of the filing of the April 26, 1976 release. We disagree. An examination of appellees' first amended petition indicates that it does not expressly state that their exclusive theory of recovery will be based on the April 26, 1976 release. While that date is mentioned in the pleadings, we do not read appellees' amended petition as being centered entirely on it. Thus, appellees were entitled to argue that they had superior title because of noncommercial production occurring anytime before August 16, 1979, from the Blair-Woody # A-1 well as well as because of the April 26th release.

Some twenty-two special issues were submitted to the jury. The jury gave the following answers:

1. Blair-Woody #A-1 was not producing in paying quantities in April, 1976.

2. A reasonably prudent operator would not have continued to operate the Blair-Woody # A-1 well for the purpose of making a profit.

3. Ladd did not act in good faith in entering upon the Blair tract and drilling the Blair # 1 well.

4. Ladd's claim to the Blair tract prevented appellees from drilling offset wells after August 16, 1979.

5. The sum of $1,185,052.75 would compensate appellees for their damages for production lost to wells on adjoining property as a result of Ladd's claim to the Blair tract after August 16, 1979.

6. Ladd's claim of title or its entry upon the Blair tract and drilling of the Blair # 1 well was actuated by actual malice.

7. Three million dollars should be assessed against Ladd as punitive or exemplary damages.

8. Ladd's filing on April 26, 1976, of a release to its Woody tract leases was not the result of a mistake of fact.

9. Ladd continued to produce and sell gas from the Blair-Woody # A-2 well, without interruption, until June, 1979, notwithstanding the filing of the April 26th release.

10. In October, 1978, Zeolah Blair was aware of the release on the Woody leases.

11. In October, 1978, Zeolah Blair's attorney was aware of the release on the Woody leases.

12. Ladd did not enter the Blair tract and drill a well thereon in May, June, and July, 1979, with the knowledge and consent of Zeolah Blair or James Shuler.

13. None of the Blair lessors indicated to Ladd, by their acts or statements, that Ladd had permission or authority to enter the Blair tract and drill a well thereon in May, June, and July, 1979.

14. (No answer needed.)

15. Appellees did not fail to advise Ladd of its claim for drainage from the Blair tract, before July 10, 1982.

16. (No answer needed.)

17. Appellee Eagle's claim to the Blair tract dod not prevent Ladd from drilling offset wells after October, 1979.

18. (No answer needed.)

19. Appellee Doug Hargis was not actuated by actual malice with respect to Ladd at the time he obtained the Blair leases dated August 16, 1979.

20. (No answer needed.)

21. Appellees Eagle was not actuated by actual malice with respect to Ladd at the time it agreed to buy the rights to the Blair leases dated August 16, 1979.

22. (No answer needed.)

In his final judgment, the trial court found, among other things, that, as a matter of law:

1. Ladd's April 26, 1976, release terminated the Blair-Woody Bend Conglomerate Unit created on April 1, 1958.

2. As a result of the termination of the Unit and concurrent lack of production from the Blair tract, the Ladd's Blair leases also terminated on April 26, 1976.

3. The Blair lessors did not ratify or revive Ladd's leases on the Blair tract after April 26, 1976.

The trial court vested title to the Blair leasehold estate in Eagle and ordered Ladd to pay appellees $1,350,273.64[1] for their actual damages and $3,000,000 as exemplary damages.

We also note that the judgment fails to recite expressly, as an alternate ground for holding that Ladd's Fulks and Blair leases terminated, that the Blair-Woody # A–1 well was no longer producing in paying quantities. Although such a recital would logically have followed given the jury's answers to special issues 1 and 2, there may nonetheless be some legal significance to the absence of an explicit reference to it in the judgment. However, even though the judgment does not expressly state noncommercial production as an alternate ground for termination, we will nonetheless consider it as one, given that both Ladd and appellees consider it as such as reflected by their appellate briefs.

### I. EFFECT OF RELEASE

■ Ladd's first six points of error deal with the consequences of the filing of the release of April 26, 1976. Ladd contends that the filing of the release on the Woody tract has no bearing on the existence of its leasehold interest in the Blair tract. To resolve this issue, we must determine whether the unit which was formed between the Blair and the Woody tract dissolved necessarily as a result of the filing of the release. We do not think it did.

There is no question that if there was no production from Blair-Woody # A–1 on April 26, 1976, or any other time thereafter while there was no production from the Blair tract, then the Fulks and Blair leases would have terminated pursuant to their habendum clauses. As it turns out, whether there was production in commercial quantities from Blair-Woody # A–1 is a contested issue on appeal, and, as pointed out above, appellees actually rely on noncommercial production as an alternate theory for termination. Thus, for the purpose of discussing Ladd's point of error that the filing of the release to the Woody tract did not terminate the Blair leases as a matter of law, we will assume that there was sufficient production from Blair-Woody # A–1 to satisfy otherwise the habendum clauses in the Fulks and Blair leases.

Proceeding under the assumption that there was commercial production from Blair-Woody # A–1, we find that the trial court erred in holding that the unit terminated as a matter of law by the filing of Ladd's release to the Woody tract.

■ As we view the problem, there is no distinction, for purposes of the existence of the unit, between a release and a mere assignment of the leasehold interest to another operator, which would not have terminated the unit. We acknowledge that a release, unlike an assignment, results not in the mere transfer of a leasehold interest to another person, but in its actual elimination as it is reconveyed to the lessor. Thus, in the case at bar, Ladd's 1976 release terminated one of the two constituent leasehold interests found in the 1958 pooling unit.

---

1. The $1,350,273.64 is calculated as follows:

| | |
|---|---|
| $222,728.51 | Stipulated value of extracted gas from Blair tract from Blair #1 well. |
| −57,507.62 | Credit for royalties paid by Ladd to Blair lessors on Blair #1 production. |
| $165,220.89 | |
| +1,185,052.75 | Calculated value lost to drainage from failure to drill offset wells after August, 1979. |
| $1,350,273.64 | |

Despite this elimination of the leasehold interest through release, the unit did not terminate. Under the Blair leases, Ladd's predecessors were authorized to pool the Blair lessors' interest with "other lands, lease or leases." Thus, Ladd's predecessors were not restricted to pooling the Blair leases with an existing leasehold estate, and the continuing validity of any such pooling was not dependent upon a subsisting leasehold estate in the adjacent land. Furthermore, the Blair leases were to remain in effect so long as gas was produced from "land with which" the Blair land was pooled, as opposed to "leasehold estate." Since this language provides that the Blair leasehold estates need not have been pooled with another leasehold estate to create a unit, the continued existence of an already viable unit does not hinge on the presence of the other leasehold estate. The termination of the other leasehold estate because of release does not in and of itself terminate the unit.

Appellees cite *Texaco, Inc. v. Lettermann*, 343 S.W.2d 726, 730 (Tex.Civ.App.—Amarillo 1961, writ ref'd n.r.e.) for the proposition that the existence of a unit depends upon the existence of its constituent leases. In *Texaco*, though, two of the three leases forming the unit terminated by their very terms in that during their primary terms there was no production. The leases did not terminate through the execution of a release. Thus, as we read *Texaco*, the critical fact was lack of production, and since we have necessarily assumed production to be present for the purposes of this discussion, *Texaco* is not controlling.

Appellees also rely on the following clauses contained in the Fulks and Blair leases respectively:

Lessee may at any time execute and deliver to Lessor or to the depository above named, or place of record a release or releases covering any portion or portions of land covered hereby, and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered, ...

\*　　\*　　\*　　\*　　\*　　\*

Lessee may at any time execute and deliver to Lessor or to the depository above named or place of record a release or releases covering any portion or portions of the above described premises and thereby surrender the lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered, ...

Appellees contend that these surrender clauses in the Blair tract leases expressly authorized Ladd's release of its leasehold interest on the Woody tract, with the ultimate consequence that Ladd surrendered its right to treat production from the Woody tract as if it were production from the Blair tract. We disagree. We first note that such surrender clauses only apply to the leasehold interests created by the Fulks and Blair leases, and not to the subsequently pooled tract. Although we presume that the Woody tract lease contained a comparable release provision, such lease was never introduced into evidence, and in any event, the Woody lessors have not asserted it as a source of termination of the unit. Even if a release to the Woody tract could activate the Blair tract surrender clauses, we fail to see that it would have the consequences urged by the appellees. The surrender clauses cited above are designed to relieve a lessee of certain obligations, such as duty to pay delay rentals, drill or develop. *Superior Oil Co. v. Dabney*, 147 Tex. 51, 211 S.W.2d 563, 565 (1948). We do not find, however, that they are designed to allow a lessee unilaterally to unpool a unit.

It is true that the pooling agreement was entered into by the holders of the leasehold interests on the Blair and Woody tract. The creation of a pooled unit by the lessees was expressly authorized by the habendum clauses in the Fulks and Blair leases. Although the Woody lease was not introduced into evidence, we can only assume that it also authorized the Woody lessee to enter into a pooling unit. But while the leases expressly authorized the lessees to pool their leasehold interests, there is no comparable language expressly authorizing

the lessees to terminate the pooling agreement. Although appellees contend that the surrender clauses effectively create such authorization in a lessee, we do not think so. As we read the leases, the power to unpool was not vested in the lessee. Therefore, an unpooling could only come about through an agreement of the lessors, or through a cessation of production as provided for in the habendum clauses. *Duffy v. Callaway*, 309 S.W.2d 853, 855–56 (Tex.Civ.App.—Eastland 1958, writ ref'd).

Based on this reasoning, Ladd's points of error challenging the jury's finding that the 1976 release was not filed through mistake (special issue 8) are immaterial. In other words, based on our reasoning, Ladd need not rely on the affirmative defense of mistake. However, if this case is appealed, and if our reasoning on the consequences of a release are rejected, then the question of mistake might be decisive. Because such a circumstance could develop, we deem it expedient to address Ladd's points of error on this issue.

 Ladd contends the evidence proves conclusively as a matter of law that the release was filed by mistake, or alternatively, that the jury's answer to special issue 8 is so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. We disagree. The jury was entitled to weigh the credibility of Ladd's testifying witness on the mistake issue. Although Ladd's witness testified that the release was filed through mistake, he was an interested witness, and as such, his testimony cannot establish any material fact as a matter of law. The testimony of an interested witness does no more than raise a fact issue. *Anderson v. Havins*, 595 S.W.2d 147, 152 (Tex.Civ.App.—Amarillo 1980, no writ). Ladd's points of error on the mistake issue are therefore overruled.

## II. PRODUCTION IN PAYING QUANTITIES

At this point we must address the critical assumption upon which the discussion in the previous section was based: was there enough production from Blair-Woody # A–1 to satisfy the habendum clauses of the Fulks and Blair leases? As pointed out above, the judgment itself does not expressly present noncommercial production as an alternate rationale for termination of the Fulks and Blair leases. The jury, though, in special issues 1 and 2 found that (1) production in paying quantities ceased "in April, 1976" and (2) that Ladd, by continuing to operate (presumably after April, 1976) Blair-Woody # A–1, was not acting as a reasonably prudent operator.

To challenge the trial court's presumed reliance on noncommercial production as an alternate rationale for termination of the Fulks and Blair leases, Ladd argues that:

1. At the very least, it is a co-tenant, since the Fulks lease habendum clause expressly negates the requirement of production in paying quantities,

2. there is no evidence and/or insufficient evidence to support special issues 1, 2.

We agree with Ladd's position concerning co-tenancy and the Fulks lease. In pertinent part, the Fulks lease states:

Subject to the other provisions herein contained, this lease shall be for a term of ten years from this date (called "primary term") and as long thereafter as oil, gas or other mineral is produced whether or not in paying quantities from said land hereunder, or land with which it or any part may be pooled.

 We have examined the record and find that it conclusively shows that, at a minimum, there was production from the Blair-Woody # A–1 well. Since, by the terms of the Fulks lease, that production need not be in paying quantities, Ladd is, at the very least, a co-tenant.

Ladd's no evidence and insufficiency evidence points essentially boil down to two questions: (1) was it error for the jury to consider production from the Blair-Woody # A–1 well occurring outside the five-day period of April 26 through April 30, 1976; and (2) did the jury err, in calculating pro-

duction in paying quantities, by including administrative and district expenses as part of operating expenses of the well?

We find there was no error in the jury's consideration of production outside the five-day window urged by Ladd. However, because the jury improperly included administrative and district expenses, there is insufficient evidence to support special issues 1 and 2, and thus we remand for a new trial on the issue of noncommercial production.

To support its position that the appellees were limited to showing noncommercial production during a five-day period, Ladd makes the following observations:

(1) the parties stipulated that the Blair leases were in force and effect on April 26, 1976;

(2) the trial court, in a written order, permitted appellees to show that "production in paying quantities ceased in April, 1976;" and

(3) special issue no. 1 was phrased in terms of cessation of production "in April, 1976."

Ladd contends that the stipulation established factually and legally that the Blair-Woody # A–1 well was producing in paying quantities up to April 26, 1976, and that the order and special issue created a cutoff after which no production could be considered. We disagree. First, the stipulation simply bore on the question of proof of title, and had no other evidentiary import. Second, it does not make sense to construe the order and the special issue as barring consideration of post April, 1976, production. As the Supreme Court stated in *Clifton v. Koontz*, 160 Tex. 82, 325 S.W.2d 684 (1959):

> There can be no arbitrary period for determining the question of whether or not a lease has terminated for the additional reason that there are various causes for slowing up of production, or a temporary cessation of production, which the courts have held to be justifiable. [Citations omitted.] We again emphasize that there can be no limit as to time, whether it be days, weeks, or months, to be taken into consideration in determining the question of whether paying production from the lease has ceased.

*Id.* at 690. Thus, we hold that on remand, appellees will be entitled to present evidence on production occurring on or after April 26, 1976.

We now turn to the question of district and administrative expenses. In his charge to the jury, the trial court defined overhead expenses as "those charges which can be traceable to the actual expenses of production of the well's product for marketing."

Ladd's manager of revenue accounting, Tommy Eubanks, testified that district expense and administrative overhead would continue in effect even if the operation of Blair-Woody # A–1 was to cease. Since there was no evidence contradicting this assertion, we accept it as true.

Ladd contends, then, that as administrative and district expenses would continue whether or not Blair-Woody # A–1 was producing, then such expenses should not be considered as overhead. We agree. We find no controlling Texas cases either expressly requiring or forbidding the prorated application of administrative or district expense to a particular well in order to find whether such well is producing oil or gas in paying quantities. Ordinary business experience would indicate that as the elimination of a single well would not materially reduce such expense, it should not be included as overhead. *See Mason v. Ladd Petroleum Co.*, 630 P.2d 1283, 1285 (Okla. 1981).

Appellees cite three cases for the proposition that a jury may consider district and administrative expenses in determining profit. *Skelly Oil Company v. Archer*, 356 S.W.2d 774 (Tex.1961); *Patton v. Rogers*, 417 S.W.2d 470 (Tex.Civ.App.—San Antonio 1967, writ ref'd n.r.e.); and *Sullivan and Garnett v. James*, 308 S.W.2d 891 (Tex.Civ.App.—San Antonio 1957, writ ref'd n.r.e.). We have examined these cases and find that the question of whether to consider district and administrative ex-

penses was not directly at issue. They are thus not controlling.

Because the trial court erred in overruling Ladd's motions to exclude such administrative and district expenses from a determination of paying quantities, the findings in special issues 1 and 2 must be dismissed and the case remanded on this question alone.

Although we are remanding on the question of paying quantities, there are nonetheless several other issues which are separable from the fact question to be determined on remand, and thus we will address them. TEX.R.CIV.P. 434.

## III. RATIFICATION

■ On remand, the fact finder may still find that production in paying quantities ceased at some point in time and that as a result Ladd's Blair leasehold interest automatically terminated. In such a case, Ladd's ratification and estoppel defense would be at issue. (We emphasize that the status of Ladd's Fulks leasehold interest will not be in question. We have examined the evidence presented on the issue of production in paying quantities, and regardless of the adjustments to be made on account of administrative and district expenses, we hold that the evidence conclusively shows that there was production, and that as a result, the requirements of the Fulks' habendum clause were met.)

The trial court held that the Blair lessors did not ratify their Blair leases. Ladd contends that the ratification and estoppel were established by the following facts: (1) Zeolah Blair knew by October, 1978 that Ladd had filed a release on the Woody estate; (2) Zeolah, Melvyn (her son) and James Shuler's communications with Ladd during the spring of 1979 amounted to a request that Ladd drill the Blair # 1 well during the summer of 1979; (3) Zeolah knew that Blair # 1 was being constructed, yet she said nothing to Ladd; and (4) the Blair lessors accepted royalty payments.

■ We disagree. First, the jury refused to find, in special issues 12 and 13, that the Blair lessors both knew and consented to Ladd's entry onto the Blair tract to drill Blair # 1 or that they indicated that Ladd had permission to do so. Ladd had the burden of proof on these special issues, and it failed to meet it. Our review of the evidence fails to show conclusively that Ladd established that it had consent or permission, and thus, these findings must stand.

Ladd argues that the Blair lessors are estopped to contest the leases because they accepted royalties. There were nine Blair lessors. Some of them refused to accept royalties while others accepted them during all critical times. Ladd specifically notes that Zeolah, who had stopped negotiating her royalty checks in October, 1978, resumed cashing them in June, 1979. Although this resumption occurred at about the same time Blair # 1 was being constructed, Ladd notes that the actual royalties were still in reference to Blair-Woody # A–1. It was not until February, 1980, that Blair # 1 started producing.

■ We reject Ladd's estoppel argument in regards to the acceptance of royalties. Assuming the leases terminated because of cessation of production, the mere continuance of the acceptance of royalties would not estop the Blair lessors from challenging the lease. *Watson v. Rochmill,* 137 Tex. 565, 155 S.W.2d 783 (1941). There must have been some affirmative act or concealment on the part of the lessors, as well as reasonable reliance by Ladd. *Gulbenkian v. Penn,* 151 Tex. 412, 252 S.W.2d 929 (1952). Here, the Blair lessors made no such affirmative act.

■ Furthermore, once a lease terminates by its own terms, it cannot be ratified or revived. *Woodson Oil Co. v. Pruett,* 281 S.W.2d 159 (Tex.Civ.App.—San Antonio 1955, writ ref'd n.r.e.); *Loeffler v. King,* 228 S.W.2d 201 (Tex.Civ.App.—Fort Worth 1950), *rev'd on other grounds,* 236 S.W.2d 772 (Tex.1951).

Thus, we hold that, if on remand, the fact finder determines that Blair-Woody # A–1 ceased production in paying quanti-

ties, then Ladd will not be allowed to assert a ratification defense.

## IV. DRAINAGE

By special issues 4 and 5, the jury awarded appellees $1,185,052.75 for damages caused by drainage. This drainage award can be understood in the following terms:

(1) by August, 1979, there were two wells on tracts of land adjoining the Blair tract which were producing successfully;

(2) any reasonably prudent operator would have drilled offset wells to these two successful wells;

(3) two wells could have been completed by November, 1979, and producing by January, 1980;

(4) based on price of gas, amount of gas, and life of well, the wells would be expected to be worth $1,185,052.75;

(5) Eagle was prevented from drilling such wells by Ladd's assertion of title;

(6) therefore, Ladd is liable to Eagle and the Blair lessors for the amount of the damages.

 Even if on remand the jury finds that Ladd's leasehold interest under the Blair tract has terminated, we find this award of damages for drainage to be improper. Eagle asserts that it acquired title in August, 1979. If, on remand, this proves true, we do not believe Eagle will be entitled to any drainage damages because, under the circumstances, Ladd was acting reasonably in failing to drill offset wells. When there is a challenge or repudiation to a leasehold interest which had been good for quite some time, the operator on the premises is justified in postponing development pending a resolution of the conflict. In the case at bar, there was a clear challenge to Ladd's leasehold interest by the granting of leases first to Hargis, and then to Eagle. Under the circumstances, Ladd was not required to drill offset wells. *Tar Heel Energy Corp. v. Menking*, 621 S.W.2d 450, 451 (TexCiv.App.—Corpus Christi 1981, no writ); *Labbe v. Carr*, 385 S.W.2d 592 (Tex.Civ.App.—Eastland 1964, writ ref'd n.r.e.); *Adams v. Cannan*, 253 S.W.2d 948 (Tex.Civ.App.—San Antonio 1952, writ ref'd).

*For the same reasons, Ladd owed no duty to the Blair lessors.* It should be noted that, as an alternative theory of damages set forth in the appellees' amended petition, the following claim for special damages is made:

Plaintiffs Blair would show that if Defendant Ladd's claims to the leasehold estate on the oil, gas and minerals in or under the Blair Tract are held valid, Defendant Ladd has breached its lease agreements with Plaintiffs Blair. More specifically, Plaintiffs would show that Defendant Ladd has failed to drill such wells as a reasonably prudent operator would drill under the circumstances ...

On appeal, the Blair lessors do not specifically reassert this alternative claim, and thus it is waived. However, even if they had, it would be blocked for the same reasons that Eagle's claim for drainages is blocked.

## V. GOOD FAITH

In Special Issue No. 3, the jury found that Ladd did not in good faith enter the Blair tract during the summer of 1979 and drill the Blair # 1 well. The trial court instructed the jury that good faith requires an honest and reasonable belief on the part of Ladd that it had a valid oil and gas lease on the Blair tract.

 Regardless of what happens on remand, this finding is legally irrelevant. We have held in this opinion that the evidence conclusively shows that the Fulks lease never terminated due to a lack of production. Consequently, Ladd is considered to be a co-tenant on the Blair tract, and as such, had the right to enter thereon. *Willson v. Superior Oil Company*, 274 S.W.2d 947, 950 (Tex.Civ.App.—Texarkana 1954, writ ref'd n.r.e.).

 If, on remand, Ladd's Blair leasehold interest is found to have terminated, then Ladd will only be a co-tenant of the

leasehold estate. In such a case, Ladd will be entitled to take into account its costs incurred in producing gas from Blair # 1 in the calculation of damages it owes to the Blair lessors for the extraction of gas. *Cox v. Davison,* 397 S.W.2d 200, 203 (Tex. 1965); *Hamman v. Ritchie,* 547 S.W.2d 698, 707 (Tex.Civ.App.—Fort Worth 1977, writ ref'd n.r.e.); *Willson,* 274 S.W.2d at 950.

## VI. EXEMPLARY DAMAGES

In Special Issue No. 6, the jury found that Ladd's claim of title or its entry upon the Blair tract and drilling of the Blair # 1 well was actuated by actual malice, defined by the court as ill will, bad or evil motive, or such gross indifference to or reckless disregard of the rights of others as will amount to a willful or wanton act. Based on this finding, the jury assessed Ladd $3,000,000 as punitive damages.

 Ladd contends there was no evidence and/or insufficient evidence to support this finding. We agree.

The special issue placed to the jury asked about two aspects of Ladd's behavior: (1) its claim of title, and (2) its entry upon the Blair tract and drilling of the Blair # 1 well during the summer of 1979.

Appellees list the following facts as evidence that Ladd was motivated by actual malice:

(1) Ladd's land manager failed to seek legal advice as to the effect of the release after he discovered it in 1977;

(2) the manager's mere assumption that title to the Blair leases was not affected;

(3) the manager's failure to provide Zeolah Blair, an elderly lady, with any information about the release;

(4) the land manager's admission that he thought the Blairs were entitled to a release;

(5) Ladd's misrepresentations in its reply letter to Zeolah's attorney in October, 1978. In this letter, Ladd stated it had "immediately" renewed its Woody leases after filing the 1976 release. In fact, it did not renew the leases until December, 1977;

(6) Ladd's account manager's admission to Ladd's former land manager the night before he testified that Blair-Woody # A-1 had not been profitable;

(7) Ladd's shelving of plans to drill a well on the Blair tract because doing so would not satisfy the requirements of the new leases with Scott Woody or the other lessors on the Woody tract;

(8) Ladd's insistence that it never knew about any drainage when its own memos and documents show otherwise;

(9) Ladd's utilization of its release for its own benefit by terminating overriding royalty interests while still insisting the release was filed by mistake;

(10) the admission of Ladd's general counsel at trial that he had never read the leases involved;

(11) Ladd's decision to renew the payment of royalties in January, 1980, to the Blair lessors, which appellees contend amounted to a calculated effort to trap the Blair lessors by estoppel.

Although these factors reflect incompetence and perhaps even that Ladd attempted to manipulate the situation, they will not support an award of punitive damages. We have already reversed the trial court's judgment insofar as it allowed for damages of $1,185,052.75 for drainage. Therefore, on remand, the only possibility of actual damages will arise from the value of extracted gas from the Blair tract pumped out by Blair # 1. The drilling of Blair # 1 was done during the summer of 1979. There is no evidence that the drilling and pumping of gas was motivated by evil intent. At most, factor 7 suggests that Ladd delayed the drilling of Blair # 1 because the drilling of it would not satisfy

any of the duties it owed to Scott Woody and the other Woody lessors. However, such a position does not reflect malice towards the Blair lessors.

The judgment below is reversed and remanded in part and rendered in part with the following instructions:

(1) the April 26, 1976 release will have no bearing on whether the pooling agreement, or the Fulks and Blair leases, has terminated;

(2) the Blair lessors and Eagle will be allowed to show that production in paying quantities from the Blair-Woody # A–1 well ceased on or after April 26, 1976, but district and administrative expenses cannot enter into the calculations;

(3) Ladd will not be allowed to assert the Blair lessors ratified the Fulks and Blair leases;

(4) the Blair lessors and Eagle will not be allowed to ask for damages due to drainage;

(5) the Blair lessors and Eagle will not be allowed to ask for exemplary damages due to Ladd's claim of title or its entry upon the Blair tract and drilling of Blair # 1.