Opinion issued March 1, 2012


 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 

 


In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-09-00328-CV

———————————

Samson Lone Star, Limited Partnership n/k/a Samson Lone Star L.L.C., Appellant

V.

Charles G.
Hooks III, Individually and as Independent Executor of the State of Charles G.
Hooks, Jr., as Trustee of the Scott IRA McKeever Trust and the David Wayne
McKeever Trust, and on behalf of Chas. G. Hooks & Son, a General
Partnership;McKeever Partnership, LTD; Charles G. Hooks III and Sue Ann Hooks,
as Co-Trustees under the Will of Charles G. Hooks, Sr., Appellees



 



 

On Appeal from the 60th District Court 

Jefferson County, Texas



Trial Court Case No. B173008-B



 

DISSENTING AND CONCURRING OPINION ON
REHEARING

I withdraw my dissenting and concurring opinion dated August
25, 2011 and substitute this opinion in its stead.  I continue to dissent in part and concur in
part.

It is undisputed that Samson drilled a directional well
bottomed within the “buffer zone” established in the Hooks’ Jefferson County
Lease (the “Lease”) and failed to elect between the three alternatives outlined
in the Lease, thus exposing itself to liability for breach of contract.  If the Lease had allowed pooling, Samson
could have solved the problem by pooling the lands covered by the Lease with
the adjacent lands.  The Lease, however,
did not allow pooling.  

Samson’s solution to this problem was to begin
misrepresenting various “facts” to escape the consequences of its actions.  Its landman, Lanoue, filed papers with the
Railroad Commission falsely certifying that Samson had pooling authority from
the Hooks.  He later filed paperwork in
the county’s real property records falsely indicating that the Hooks had
already agreed to pool.  Lanoue then sent
a letter to the Hooks asking them to agree to pool the westernmost 50 acres of
the Hooks’ acreage in the Lease into the BSM 1 Unit.  When Charles Hooks called Lanoue and asked
for more information about the well’s location, Lanoue represented to Hooks
that the well was located approximately 1500 feet from the lease line, a
location outside the buffer zone.  When
Charles Hooks asked for a plat, Lanoue faxed him one that represented a bottom-hole
location that was +/- 1400 feet from the lease line, the accuracy of which he,
Lanoue, had certified with no reference to an actual bottom-hole location,
although it was ascertainable from a prior directional survey.  Instead, when asked the origin of those
measurements, he answered: “I got them from myself.”  On this basis the Hooks agreed to the
formation of the unit.

Thus it is clear that Samson, through its representative,
took action to cover up its own error by both oral and written
misrepresentations to its lessor, born of “assuming” and “hoping.”  It is further clear that the Hooks, after
asking for and receiving verification of Lanoue’s oral representation in the
form of a plat, believed its lessee’s representations and made no attempt to go
beyond them to discover the truth or falsity thereof.  On these facts, the majority has found that
the discovery rule does not apply to the Hooks’ fraud, fraudulent inducement,
and statutory fraud claims and that they are barred by limitations as a matter
of law.

I reluctantly concur, based on the Texas Supreme Court’s
holding in BP America Production Co. v. Marshall,
342 S.W.3d 59 (Tex. 2011).  In that case,
the Texas Supreme Court makes clear that no lies on the part of a lessee,
however self-serving and egregious, are sufficient to toll limitations, as long
as it is technically possible for the lessor to have discovered the lie by
resort to the Railroad Commission records. 
This burden the Court imposes upon lessors is severe.  It is now a lessor’s duty to presume that any
statement made by its lessee is false and to ransack the esoteric and
oft-changing records at the Railroad Commission to discover the truth or falsity
of its lessee’s statements.  If, as is
often the case, these records are technical in nature and require expert review
to ferret out the truth, it is the lessor’s job to hire experts out of its own
pocket to perform such a review.  If a
lessor fails to take these steps, then it will have failed in exercising
reasonable diligence to protect its mineral interests and, if the lessee’s
fraud is successful for longer than the limitations period, the lessor’s claims
will be barred by limitations.

Such is the case here. Had the Hooks presumed that Samson’s
oral representations, followed by written representations, about the
bottom-hole location of the well were false, and had they hired an expert to
resort to Railroad Commission records to trace the various filings (some of
which were also false), that expert could have hit upon the directional survey
and, by virtue of his expertise, interpreted it to prove the falsity of the
representations.  Instead they merely
relied on the oral and written representations of their lessee, without
undergoing what doubtless seemed to them the useless expense of hiring an
expert to rake through the Railroad Commission records with an eye towards
exposing a potential falsehood.  

I believe the Texas Supreme Court has placed an unnecessary
and very heavy burden on lessors by its ruling in BP America, one that will result either in much money being spent
unnecessarily on prophylactic forensic review of Railroad Commission records or
in many viable claims being lost to limitations.  As we are, however, bound to follow the
Court’s rulings, I reluctantly concur in that part of the opinion that finds
the Hooks’ fraud, fraudulent inducement, and statutory fraud claims barred by
limitations as a matter of law.

I dissent, however, to that part of the majority’s opinion
that sustains Samson’s challenge to the trial court’s findings concerning
“unpooling” by amending a unit.  

Early in 2001, Samson drilled the Black Stone Minerals No.
A-1 well (“BSM A-1 Well”) on a separate Samson lease. The mineral interests
underlying this lease were owned 87.5% by Black Stone Minerals and 12.5% by
FirnBank. 

Because Samson was without contractual authority to pool
pursuant to its leases with either Black Stone or FirnBank, it sought to
negotiate with them for such a right. 
Before such agreement, if any, was reached, however, Samson unilaterally
concluded that both of the lessors were in agreement.  Pursuant to this unilateral conclusion, in
March 2001, Samson filed a unit designation for a 704-acre unit called the
Black Stone Minerals “A” No. 1 Gas Unit (the “BSM A-1 Unit”), which unitized
the above-described leases as well as the Hooks’ Hardin County leases (the
“Hardin County Leases”).  The designation
recited that it was effective as of the date of first production.  Firnbank consented to the pooling in May
2001. Written consent to pool was also obtained from the Hooks.  The 87.5% interest owner, Black Stone
Minerals, however, declined to consent.  

Samson drilled and completed the BSM A-1 Well and it began
producing in June 2001 from the depth range of the BSM A-1 Unit as designated
by Samson.  In December 2001, Samson
finished another gas well (“Joyce DuJay No. 1 Well”) from the surface of the
BSM A-1 Unit that was completed within the area and depth limits of the BSM A-1
Unit. In February 2002, Samson executed and recorded a designation for a Joyce
DuJay No. 1 Gas Unit (“DuJay 1 Unit”) that recited an effective date as of
first production of the DuJay No. 1 Well. 
Although termed an “Amendment” of the BSM A-1 Unit, it designated a new,
smaller, 570-acre unit with a different name, different leases, different
depths and different boundaries than the BSM A-1 Unit.  The DuJay 1 Unit included some of the deeper
strata of the BSM A-1 Unit, but excluded the horizon from which the BSM A-1
Well was producing.  Thereafter, the BSM
A-1 Well was produced as a lease well, not included in any unit.  Subsequently, Samson drilled another DuJay
well (“DuJay A-1”) and created a separate unit for that well (the “DuJay A-1
Unit”).  The DuJay A-1 Unit differed from
the DuJay 1 Unit by depth limitation and acreage.  The Hooks’ Hardin County Leases were listed
in all three unit designations:  the BSM
A-1, the DuJay 1, and the DuJay A-1.  

Samson claimed that the DuJay 1 Unit was an “amendment” of
the BSM A-1 and thus that the BSM A-1 Unit no longer existed.  In other words, it took the position that,
because it failed to sign up all the other leaseholders in the BSM A-1 Unit, it
could “de-designate” the earlier-designated BSM A-1 Unit.  If Samson was correct, it did not need to pay
the Hooks for their proportionate share of the BSM A-1 Well; if not, it did.

The Hooks moved for summary judgment claiming that Samson had
no authority to terminate or invalidate the BSM A-1 Unit and therefore had
breached its lease contract by failing to pay the Hooks royalties on the BSM
A-1 Well.  The trial court granted this
motion.  Samson, in its sixth point,
contends that the trial court erred in granting this motion (and in denying its
own cross-motion).  

The majority
opinion holds that, by accepting royalties from the DuJay 1 and DuJay A-1
Units, the Hooks “accepted” those units and thus, “[t]heir interest in the BSM
A-1 unit was, therefore, terminated, and they are estopped to deny the validity
of the unitization agreements for the DuJay 1 and DuJay A-1 as to their
interest therein.”  The majority bases
this decision on its conclusion that “a previously
designated unit necessarily terminates upon the agreement of all the parties to
the agreement to participate in a unit that is incompatible with the prior
unit; and the parties who have consented to a new unitization of the same interests
are estopped to deny termination of the prior inconsistent unit designation.” 
The majority posits that accepting royalties from a unit the depth or
acreage of which overlaps at all with any other unit amounts to a de facto
agreement to terminate any earlier unit containing any part of the same depth
or acreage.

The Hardin County Leases, however, contain no such
limitations.  Instead, the Hardin County
Leases give Samson the right to exercise pooling authority multiple times, “at
any time and from time to time.”  The
language of the leases neither limits this pooling authority to certain depths,
nor states or implies that pooling is only valid when the multiple pools do not
overlap at any depth.  To hold instead
that the right to pool multiple times is limited
to units that have no overlap is to imply a term in the contract that does not
exist.  A court is not free to make
contracts for parties, nor must it imply terms in a contract without exercising
extreme caution.  See Universal Health Servs., Inc. RCW v. Renaissance Women’s Group,
P.A., 121 S.W.3d 742, 747 (Tex. 2003). 
The Texas Supreme Court has held that “terms are to be implied in
contract, not because they are reasonable, but because they are necessarily
involved in the contractual relationship, such that the parties must have
intended them and must have failed to express them only because of sheer
inadvertence or because they are too obvious to need expression.”  Mann
Frankfort Stein & Lipp Advisors, Inc. v. Fielding, 289 SW.3d 844, 850
(Tex. 2009) (citing 11 Richard A. Lord, Williston
on Contracts § 31:7 (4th ed. 1999)). 
The rule set up by the majority is not one that is “necessarily
involved” in the contractual relationship between a lessor and lessee and we
ought not imply it.

If such a limitation
to the right to accept royalties from multiple pools exists, then, it must
exist as a matter of law.  The majority,
however, cites no law for the proposition that accepting royalties from more
than one unit covering some of the same depths and lands (termed “conflicting”
units in the majority opinion) serves to terminate an earlier-designated
unit.     

Instead, it is black-letter law that a lessee cannot
unilaterally terminate a unit, once formed. 
Good-faith pooling can be exercised multiple times.  Expando
Prod., Co. v. Marshall, 407 S.W.2d 254, 259–60 (Tex. Civ. App.—Fort Worth  1966, writ ref’d n.r.e.) (citing Texaco, Inc. v. Letterman, 343 S.W.2d
726, 731 (Tex. Civ. App.—Amarillo 1961, writ ref’d n.r.e.).  The right to pool leases, however, does not
mean the lessee can unilaterally terminate a unit that has a producing pooled
well.  See Ladd Petroleum Corp. v. Eagle Oil & Gas Co., 695 S.W.2d 99,
106–07 (Tex. App.—Fort Worth 1985, writ ref’d n.r.e.).  When a lease provides that a lessee may
dissolve a unit, once formed, when there is no “unitized substance” being
produced from the unit, the lessee may not dissolve a unit as long as a well is
still producing on it.  See Williamson v. Mobil Producing Tex. &
N.M., Inc., 737 S.W.2d 917, 921 (Tex. App.—Beaumont 1987, writ denied) (“So,
clearly, the lessee, if it is ‘after the discovery of the same,’ can change the
pooling unit only subsequent to the cessation of production.”).

Here, no party argues
that there was a cessation of production from the BSM A-1 Unit.  The only basis for finding that the BSM A-1
Unit was no longer valid is the majority’s holding that, by accepting royalty
on “conflicting” pooled units, the Hooks accepted those units and thus their
interest in the BSM A-1 Unit terminated and they are estopped to deny the
validity of the unitization agreements for the DuJay 1 and DuJay A-1 as to
their interests.  The majority cites
three cases in support of this proposition. 
See Cambridge Prod., Inc. v. Geodyne Nominee Corp., 292 S.W.3d 725, 732 (Tex.
App.—Amarillo 2009, pet. denied); Ladd, 695 S.W.2d at 107; Whelan v. Placid Oil Co., 274 S.W.2d 125, 128 (Tex. Civ. App.—Texarkana
1954, writ ref’d n.r.e.).  None, however,
actually supports the majority’s position. 
Cambridge holds that a
top-lessee, the rights of which derive from its underlying lessors, is estopped
from taking the position that a unit is terminated when its underlying lessors
had taken an inconsistent position by accepting royalties from the unit.  Cambridge,
292 S.W.3d at 732.  Ladd holds that “an unpooling could only come about through an
agreement of the lessors, or through a cessation of production as provided for
in the habendum clauses.”  Ladd, 695 S.W.2d at 107.  In Whelan,
the Texarkana court found that parties that have accepted royalty pursuant
to a unitization agreement are estopped from denying the validity of the
unitization agreement.  Whelan, 274 S.W.2d at 128.     

All of these cases are distinguishable from the case at bar
and none set up the rule that the majority asserts.  The Hooks do not deny that they have
“consented” to the DuJay 1 Unit. 
Instead, their position is that each of the units (the BSM A-1 Unit, the
DuJay 1 Unit and the DuJay A-1 Unit) is independent of the other, and all could
and did exist at the same time.  Samson
did not exhaust its right to pool by designating the BSM A-1 Unit, so its later
DuJay 1 and DuJay A-1 Units were also valid. 
This position is consistent with the language of the pooling clause
itself, which states that “[t]he above right and power to pool may be exercised
at any time and from time to time.”  

The majority’s ruling creates a new limitation on pooling,
one found neither in the language of the Hardin County Leases nor in case law,
and one which has serious ramifications for the oil and gas industry.  I believe that this limitation is legally
unsupported, unnecessary, and detrimental to the legitimate interests of both
lessors and lessees.  

For
the reasons set forth above, I dissent to the portion of the majority’s opinion
sustaining Samson’s sixth issue.

 

 

                                                                   Jim
Sharp

                                                                   Justice


 

Panel
consists of Justices Keyes, Sharp, and Massengale.

Justice
Sharp, concurring in part and dissenting in part.