Opinion issued August 25, 2011.


 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 

 


In The

Court of Appeals

For The

First District of Texas

————————————

NO. 01-09-00328-CV

———————————

Samson Lone
Star, Limited Partnership n/k/a Samson Lone Star L.L.C., Appellant

V.

Charles G.
Hooks III, Individually and as Independent Executor of the EState of Charles G.
Hooks, Jr., as Trustee of the Scott IRA McKeever Trust and the David Wayne
McKeever Trust, and on behalf of Chas. G. Hooks & Son, a General
Partnership;McKeever Partnership, LTD; Charles G. Hooks III and Sue Ann Hooks,
as Co-Trustees under the Will of Charles G. Hooks, Sr., Appellees



 



 

On Appeal from the 60th District
Court

Jefferson County, Texas



Trial
Court Case No. B173008-B[1]

 



O P I N I O N

          This is an appeal from a final judgment
against appellant Samson Lone Star, Limited Partnership n/k/a Samson Lone Star L.L.C.
(“Samson”) for more than $21 million in favor of appellees Charles G. Hooks, et
al. (“the Hooks”).  Samson has a number
of oil and gas leases from landowners in Hardin and Jefferson Counties.  The judgment arises from an oil and gas case
in which the Hooks brought suit against Samson with respect to three oil and
gas leases, two in Hardin County, Texas (the “95-acre Lease” and the “10-acre
Lease,” collectively the “Hardin County Leases”) and one in Jefferson County,
Texas (the “Jefferson County Lease”). 
The Hooks sued Samson for breach of contract, fraud, fraudulent
concealment, statutory fraud, negligent misrepresentation, violation of the
Texas Natural Resources Code for failure to properly pay royalties, statutory
negligence, common law negligence per se, injunctive relief, and declaratory
judgment.  The trial court granted Samson’s motion for
partial summary judgment on whether it had breached certain offset obligations
under the leases.  It also granted the
Hooks’ motions for summary judgment on claims for additional royalties related
to their claims of “unpooling” with respect to the Hardin County Leases and
breach of the “most favored nations” clause in both Hardin County Leases and
the Jefferson County Lease.  

          The questions of whether
Samson committed fraud against the Hooks with respect to a well drilled within
the buffer zone of the Hooks’ Jefferson County Lease and whether it underpaid
royalties by not paying royalties for “formation production” in all three
Leases were tried to a jury.  The trial
court rendered judgment on the verdict, holding Samson liable to the Hooks for
fraud and underpaid royalties, and it entered a final judgment that left intact
the summary judgment in Samson’s favor on offset obligations and the summary
judgments in favor of the Hooks on their unpooling claim and their most favored
nations clause claims.  Samson has
appealed the final judgment and the Hooks have cross-appealed.  

In eight issues, Samson complains that (1) there is
legally and factually insufficient evidence of common law fraud; (2) there is
legally and factually insufficient evidence of statutory fraud; (3) the statute
of limitations bars the Hooks’ fraud claims; (4) there is legally and factually
insufficient evidence to support the jury’s finding on fraud damages; (5) the
trial court erred in interpreting the phrase “formation production” in the
Hooks’ Leases as requiring Samson to pay twice for molecules of gas produced as
condensate; (6) the trial court erred in entering judgment in favor of the
Hooks for additional royalties based on the unpooling issue with respect to the
Hardin County Leases and on the most favored nations clauses in all three Leases;
(7) the trial court erred in elevating lease provisions into a permanent
injunction, and there is no evidence to support the injunction or attorney’s
fees; and (8) the trial court erred by granting post-judgment interest at the
rate of 18%, compounded annually.[2]


          In a single issue, the Hooks
complain on cross-appeal that the trial court erred in rendering summary
judgment in favor of Samson on the issue of whether Samson breached certain
offset obligations in the Hooks’ leases. 
We affirm the trial court’s summary judgment order in favor of Samson on
its offset obligations.

          With respect to Samson’s
appeal, we reverse the final judgment of the trial court and render judgment that
the Hooks take nothing.

I.     
SAMSON’S APPEAL

A.  
BACKGROUND

 

1.     Facts Related to the Jefferson County
Lease and the BSM 1 Unit

          In 1999, the Hooks entered into the Jefferson County Lease
with Samson.  This lease covered 640
acres owned by the Hooks in the Dyches survey in Jefferson County, Texas and
was bordered by Pine Island Bayou, which also serves as the county line between
Jefferson and Hardin Counties.  

Article VI
of the Jefferson County Lease was a section called “Offset Obligations.”  In this section, Samson covenanted to operate
the leased premises as a reasonably prudent operator would and to protect the
leased premises from drainage.  Article
VI also contained specific obligations for Samson in case of potential drainage.  This Article provided that if a gas well were
completed within 1,320 feet from the leased premises, then, within 90 days from
the date of the sale of first production from that well, Samson must take one
of three actions: (1) drill an offset well; (2) pay the Hooks “compensatory
royalties”—in addition to any royalties
currently due—in a sum equal to the
royalties that would be payable under the Lease on the production from the adjacent
or nearby producing well if it had been producing on the leased premises; or (3)
release the offset acreage.[3]  The Jefferson County Lease did not provide
for pooling.

          In April 2000, Samson began drilling a gas well, the Black
Stone Minerals No. 1 (the “BSM 1 well”), on a tract adjacent to the Hooks’ 640-acre
Jefferson County Lease.  This adjacent
tract was located in Hardin County.  The
surface drillsite was outside the 1,320-foot buffer zone around the Jefferson
County Lease that triggered Samson’s offset obligations under Article VI(A) of
the Lease.  However, the BSM 1 was a
directional well that slanted away from the surface drillsite.  Originally, the well was planned with a bottom
hole location 1,080 feet from the Hooks’ lease line, a location within the
1,320-foot buffer zone.  This proposed
well location was reflected on a plat titled “Proposed Well Location [BSM]1
Walker Pettitt League, A-43, Hardin County, Texas,” which was prepared and
signed by a third-party surveyor on March 22, 2000.  The surveyor certified that “this is a true
and correct plat based on a ground survey made under my supervision on March
22, 2000.”  This plat was filed with the
Railroad Commission of Texas (“Railroad Commission”).

          The March 22, 2000 plat showed a
704.00 acre gas pooling unit designated by Samson that ran along Pine Island Bayou,
the Jefferson County line, on the east. 
This line was also the western boundary of the tract containing the
Hooks’ Jefferson County Lease.  The Hooks
and their co-owners of the tract on which their Jefferson County Lease was
located were not named as lessors in the table shown on the plat of the
designated unit.  An arrow shown on the
plat pointed to the location of the proposed bottom hole about at the beginning
of a line that ran to the eastern line of the unit at Pine Island Bayou.  Notations on the plat stated:

The
Proposed Surface Location is:  

630′
FSL x 1600′ FEL Survey

2750′+ Scaled FWL x 3834′
FNL Unit.

 

The
Proposed Bottom Hole Location is:  

330′
FSL x 330′ FEL Survey

870′+ Scaled FSL x 1080′+ Scaled′
FEL Unit.

 

It is undisputed that “FSL”
meant “From the Southern Line” of the Walker Pettitt Survey, “FNL” meant “From
the Northern Line” of the Survey, and “FEL” meant “From the Eastern Line” of
the Survey, which was the Jefferson County line at Pine Island Bayou.  Thus, in this notation, the surface location
of the BSM 1 well was 1,600 feet from the eastern line of the survey, and the
proposed bottom hole location was about 1,080 feet from the eastern line, which
marked the western line of the Hooks’ Jefferson County Lease.  The proposed bottom hole was therefore within
the 1,320-foot buffer zone for the Hooks’ Lease.

Although
the March 22, 2000 plat of the designated BSM 1 unit estimated the location of
the proposed bottom hole location of the BSM 1 well, the exact bottom hole
location of the well, following drilling, could only be ascertained from a
directional survey.  This survey was
completed in July 2000 and was also filed with the Railroad Commission.  Both parties agree that the survey showed the
BSM 1 well to be bottomed 1,184 feet from the Jefferson County Lease, within
the 1,320-foot buffer. 

The BSM 1 well
was completed in August 2000, and the first gas sales occurred in late October
2000.  Because the bottom hole of the
well was within the 1,320-foot buffer zone of the Jefferson County Lease, the
first gas sales triggered Samson’s offset obligations under the terms of the
Lease.  The Hooks complain, and the jury
found, however, that Samson did not follow the provisions in Article VI(A) of
the Hooks’ Lease which provided that, within 90 days of the first sale of gas
from a well within its buffer zone, Samson must drill an offset well, pay the Hooks
compensatory royalties, or release the offset acreage.  Instead, the jury found that Samson attempted
to avoid those obligations by seeking to pool the Hooks’ interest with those of
other mineral owners despite the lack of pooling authority in the Jefferson
County Lease while concealing the bottom hole location of the BSM 1 well.

In December
2000, Samson filed a P-12 “Pooling Authority” form with the Railroad Commission
that reflected an amended pooling unit.  By
letter, Samson informed the Commission that a portion of the 704 acres in the
original BSM 1 unit was to be put into a separate 308.41-acre pooling unit for
the proposed Black Stone Minerals No. A-1 well (“BSM A-1 well”).  Attached to the letter was a “Certificate of
Pooling Authority,” which represented the Broussard tract, on which the
Jefferson County Lease lay, as one of the tracts whose mineral-rights owners either
had given Samson pooling authority under an instrument currently in effect or
had pooled their interests into the amended BSM 1 unit.  Also attached was a plat of a revised 704-acre
pooling unit dated November 16, 2000 and certified by Samson’s land man, Glenn Lanoue.  

The arrows
pointing to the surface and bottom hole locations on the November 16 plat of
the redesignated BSM 1 unit were the same as those pointing to the proposed
surface and bottom hole locations on the original March 22, 2000 plat of the
unit.  However, the acreage of the unit had
been changed to show a different 704-acre BSM 1 unit from that originally filed
with the Railroad Commission.  This unit,
unlike the previously designated BSM 1 unit, extended beyond the eastern line of
Pine Island Bayou into Jefferson County. 
The certificate, signed by Lanoue, stated that “this is a true and
correct plat based on the best of my knowledge November 16, 2000.”  

On February
15, 2001, Samson sent the Hooks a letter offering to pool 50 acres covered by
the Hooks’ Jefferson County Lease into the redesignated gas pooling unit for
the BSM 1 well.  Attached to the letter
was a copy of the revised plat Samson had filed with the Railroad Commission in
December 2000.

On February
20, 2001, before accepting Samson’s offer to pool—which would require amendment of Article VI of the Jefferson County Lease
to permit pooling—Charles
Hooks, an attorney who had participated in a number of oil and gas deals,
called Lanoue and sought more information. 
Charles Hooks inquired about the well’s location and about how his
property fit in the unit.  Lanoue told
him that the well was about 1,500 feet away from Pine Island Bayou, the
boundary between Hardin and Jefferson Counties and the western line of the Hooks’
Jefferson County Lease.  Hooks requested
a plat showing where his acreage would lie within the proposed configuration of
the unit.  

That same
day, Lanoue sent Hooks the same scaled plat of the redesignated pooling unit that
Samson had filed with the Railroad Commission in December 2000, except that
this version highlighted the configuration of the Hooks’ acreage on the eastern
side of the lease between Pine Island Bayou and the eastern line of the
reconfigured pooling unit.  This plat was
certified by Lanoue as “a true and correct plat based on the best of my
knowledge December 28, 2000.” 

          A number of changes had been made to
the original March 28, 2000 plat to reflect the redesignated BSM 1 unit.  The plat of the unit had been changed to
reflect a substantially reconfigured unit with different boundaries extending
further west and also further east into Jefferson County, encompassing part of
the Broussard tract on the east that had not been included in the original unit
designation.  The plat had been
highlighted to show the location of the Hooks’ 50 acres.  East/west coordinates of the bottom hole of
the BSM 1 well had been changed from those of the proposed bottom hole on the
March 2000 plat.  At trial, Lanoue
testified that he changed these coordinates with a ruler.  

          Like the March 2000 plat, the plat of
the redesignated BSM 1 unit contained the arrow pointing to the location of the
bottom hole, but it gave slightly changed coordinates.  And, instead of a line running from the
proposed bottom hole location and showing +1,080 feet to the eastern
line of the unit at Pine Island Bayou, the plat showed a different line to the
bayou with an undesignated starting point.  It also showed an eastern border of the unit
beyond the bayou and encompassing a portion of the Hooks’ Lease.  Above the line was the designation “+1400′.” 
An arrow stating “BHL” and giving the well coordinates pointed to a
point on the line about one quarter of the way from the western starting point
of the line to the eastern end of the line at the bayou.  Thus, if the designation “+1400′” were interpreted as the distance
from the bottom hole to the bayou, the bottom hole of the BSM 1 well would be
outside the 1,320 foot buffer zone for the 
Jefferson County Lease.  If the “+1400′ ” designation were interpreted as
the distance from the undesignated starting point of the line to the bayou and
the arrow one-quarter of the way along it were interpreted as the bottom hole
location, the bottom hole of the well would be within the buffer zone of the
Hooks’ Lease, triggering Samson’s offset obligations.

          In addition, the plat stated:  

The
Bottom Hole Location is:  

290′
FSL x 740′ FEL Survey

500′
Scaled FNL x 1400′ + Scaled′
FEL Unit.

 

This language in the plat
thus expressly stated that the bottom hole of the BSM 1 well was located about
1,400 feet from the eastern line of the redesignated unit, which encompassed
the Hooks’ 50 acres from their Jefferson County Lease.  According to this notation, the bottom hole
of the BSM 1 well was inside the buffer zone for the Hooks’ Lease.  

          Lanoue testified at trial that he added the notation that
showed the bottom hole to be + 1,400 feet from the eastern line of the
unit in August 2000 to reflect the newly shaped unit.  He also testified that he got the notation
“740 feet from the east line and 290 feet from the south line” “from myself.”  He did not go to the directional survey which
had been previously completed to determine the exact location of the bottom
hole.  However, he intended the numbers
to be “[a]s accurate as a land guy is using a ruler on a scaled piece of paper
that might not even be to scale.”  

Hooks
testified at trial that Lanoue orally told him that the well was 1,500 feet
from Pine Island Bayou.  He then looked
at the plat and concluded that the bottom hole location was approximately 1,400
feet west of Pine Island Bayou and thus outside the line that would have
triggered the offset provisions in the Jefferson County Lease.  He made no other inquiries regarding the plat
or the bottom hole of the well, and he did not check the records filed with the
Railroad Commission to determine the exact location of the bottom hole.

          After making the pooling offer to the Hooks, Lanoue filed
paperwork in the county’s real property records in February 2001 showing the
Hooks as participating in the pool for the BSM 1 unit.  However, the Hooks did not actually consent
to pool the 50 acres from the Jefferson County Lease into the BSM 1 unit until
May 25, 2001, and they conditioned their assent on a formal amendment to the
lease which they were to prepare and submit to Samson.  The Hooks did not prepare the formal
amendment, however, and the parties never executed such an amendment.  Instead, the Hooks agreed to a division order
setting out their percentage distribution of the unit’s proceeds, which stated
that Samson would pay the Hooks royalties based on a stated percentage of their
acreage in the unit to the entire acreage of the BSM 1 unit unless notified
otherwise in writing.  

          After the Hooks agreed to be included in the BSM 1 unit,
Samson sent royalty checks to them for their unit interest continuing through
the time of trial, and the Hooks cashed the royalty checks.  However, the royalty checks did not include the
additional compensatory royalties as calculated under the terms of Article VI
of Hooks’ Lease for a well drilled within the 1,320-foot buffer zone of the Hooks’
Jefferson County Lease.

After the
Hooks agreed to pool 50 acres of their Jefferson County Lease into the BSM 1
unit, Samson drilled a second well, the Joyce DuJay No. 1 well (“DuJay 1 well”),
within the 1,320-foot buffer zone of the Hooks’ Jefferson County Lease.  That well was completed in January 2002 and
made part of another pooling unit, the DuJay 1 unit, in which the Hooks also
participated and from which they received royalties.  This well was offset by the BSM 1 unit.  Hooks testified that he was not defrauded with
respect to the DuJay 1 unit.

2.    
Facts
Related to the Hardin County Leases and the Hooks’ “Unpooling” Claim

 

          In addition
to their Jefferson County Lease, the Hooks also owned two leases in Hardin
County near the BSM 1 well, the 95-acre and 10-acre Hardin County Leases.  Unlike the Hooks’ Jefferson County Lease, these
Leases did provide for pooling in terms that were essentially the same with
respect to the manner and methods of pooling. 


          The
Hardin County Leases both contained language calling for an instrument
“identifying and describing the pooled acreage” and stating that a “pooled unit
shall become effective on the date such instrument or instruments are so filed
for record.”  Article V(E) of the pooling
provision in each Lease also stated that production from any part of a pooled
unit that included the leased premises was considered production from the
leased premises “regardless of whether . . . such production was secured before
or after the date of this lease or the date of the instrument designating the
pooled unit.”  The 95-acre Lease provided in Article V(E) as follows:

E.  Lessee [Samson], at its option, is hereby
given the right and power in its discretion to pool or combine, as to any one
or more formations, the land covered by this Lease or any portion of said land,
insofar only as gas or gas condensate rights are concerned . . . with other
land, lease or leases in the immediate vicinity thereof, except to the extent
and in the manner hereinafter stipulated. 
With respect to any such unit so formed, Lessee shall execute in writing an instrument or instruments
identifying and describing the pooled acreage, and file same for recording in
the office of the County Clerk in Hardin County, Texas; and the pooled unit
shall become effective on the date such instrument or instruments are so filed
for record.  Notwithstanding anything
hereof to the contrary, pooled units
created hereunder and comprising all or part of the herein leased premises shall not exceed the maximum acreage figures
permitted for all production units of oil or gas wells completed at certain
depths under Article V. hereof unless the Railroad Commission of Texas or
any governmental authority having and asserting jurisdiction over the subject
matter thereof prescribes for the
drilling or operation of a well at a regular location, or permits for the
obtaining of the maximum allowable from any well to be drilled, drilling, or
already drilled, larger pooled units than any of those herein permitted,
then any such pooled unit may be established or enlarged to conform to the size
either required of a well or permitted for the obtaining of the maximum
allowable.  For any well drilled on and
completed at depths beneath the surface of a tract covered by this lease there
shall be no pooling with other lands, unless such tract is insufficient, due to
either its lack of size or prior unitization hereunder, to comprise the maximum
acreage figures permitted hereunder in which case all of said tract (95 acres
more or less) or the then un-unitized portion of same shall be so pooled; and
Lessee may include in such pooled unit such other acreage as may be available
to comprise the maximum acreage figures permitted under the terms of this lease.  For a
well drilled on or completed at depths beneath the surface of lands other than
the herein leased premises, not less than all (100%) of the lands (95 acres
more or less) or the then un-unitized portion of same shall be so pooled; and
Lessee may include in such pooled unit such other acreage as may be available
to comprise the maximum acreage figures permitted under the terms of this
lease.

 

Operations for drilling on
or production of gas from any part of the pooled unit which includes all or a portion
of the Leased Premises, regardless of whether such operations for drilling were
commenced or such production was secured before or after the date of this lease
or the date of the instrument designating the pooled unit, shall be considered
as operations for drilling on or production of gas from the Leased Premises,
whether or not the well or wells be located on the Leased Premises, and the
entire acreage constituting such unit or units shall be treated for all purposes, except the payment of royalties on
production from the pooled unit, as if the same were included in this Lease.
The above right and power to pool may be exercised at any time and from time to
time and before or after a well has been drilled, or while a well is being
drilled.  Lessee may vacate any unit formed by it hereunder by instrument in
writing filed for record in said county at any time when there is no unitized
substance being produced from such unit. 
The pooling for gas hereunder by Lessee shall also pool and unitize all
liquid gas, and the royalty interest payable to Lessor thereon shall be
computed the same as on gas.  For the
purpose of computing the royalties to which owners of royalties shall be
entitled on production from each production unit, there shall be allocated to the applicable separate tract acreage
included in such production unit a pro rata portion of the production produced
from such production unit.  Such
allocation shall be on an acreage basis; that is to say, there shall be
allocated to the applicable separate tract acreage within the unit that pro
rata portion of the production produced from the production unit which the
number of surface acres covered by such separate tract and included in the
production unit bears to the total number of surface acres included in the
production unit, commencing with the date of first production from the
production unit.

(Emphasis added.)

          Early in 2001, Samson drilled the BSM
A-1 well on Samson’s own lease in Hardin County.  The mineral interests underlying this lease
were owned 87.5% by Black Stone Minerals and 12.5% by FirnBank as cotenants. 

          Samson did not have the contractual
authority to pool under its leases with either Black Stone Minerals or
FirnBank.  Samson therefore negotiated
with the leaseholders for such a right and concluded that both of the lessors
were in agreement.  Accordingly, on March
12, 2001, Samson filed a Unit Designation for a 704-acre unit called the Black
Stone Minerals “A” No. 1 Gas Unit (the “BSM A-1 unit”).  This unit designation unitized the Black
Stone Minerals/FirnBank lease, as well as the Hooks’ 10-acre and 95-acre Hardin
County Leases and other tracts, including leases beneath Pine Island Bayou
owned by the State.  The designation
reflected that it was effective as of the date of first production, and it included
a list of the leases pooled, including the Hardin County Leases.  The designation for the BSM A-1 unit included
gas production at all depths between 6,000 and 13,800 feet.

          FirnBank consented to be pooled into
the BSM A-1 Unit in May 2001.  Samson
also obtained written consent from the Hooks to pool their lease into the BSM
A-1 unit.  In addition, it obtained the
agreement of the Texas General Land Office and the School Land Board
(collectively, the “State of Texas”), who owned adjacent land, to pool that
land into the unit.  However, Black Stone
Minerals, the 87.5% owner of the mineral interests underlying the drillsite, declined
to consent.

          Samson
drilled and completed the BSM A-1 well, and it began producing in June 2001
from the depth range of the BSM A-1 unit designated by Samson, specifically at
the horizon from 12,304 to 12,332 feet.

          In December 2001, Samson finished
another gas well, the DuJay 1 well.  The
DuJay 1 well produced from some of the same land designated to the BSM A-1 unit,
but it reached from 13,150 to 13,176 feet—lower strata than the BSM A-1 well.  The DuJay 1 well was within the area and
depth limits of the BSM A-1 unit.  The DuJay
1 well began producing in January 2002. 

          In
February 2002, after failing to receive Black Stone Minerals’ consent to the
BSM A-1 unit, Samson executed and recorded a designation for a new unit, the
Joyce DuJay No. 1 Gas unit (“DuJay 1 unit”) that recited an effective date as
of first production of the DuJay 1 well. 
Samson called the designation of the DuJay 1 well an “amendment” of the
704-acre BSM A-1 unit designation, but it designated a new, smaller, 571-acre
unit with a different name, different leases, different depths and different
boundaries from the BSM A-1 unit.  The DuJay
1 unit included some of the deeper strata of the originally designated BSM A-1
unit, but it excluded the horizon from which the BSM A-1 well was producing at
12,304 to 12,332 feet.  Instead, the
designated DuJay 1 unit pooled its leases as to gas well production from 12,800
feet and deeper, including some already-pooled depths carved out of the BSM A-1
unit (12,400–13,800 feet) and deeper strata (below 13,800 feet).  Because of its depth limitations, the DuJay 1
unit included the DuJay 1 well, but not the shallower-completed BSM A-1 well.  The designated acreage excluded most of the
Black Stone/FirnBank lease, but it included the Hooks’ Hardin County Leases and
the State’s leases.

          Samson
did not get consent from the Hooks to vacate or amend the BSM A-1 unit or to
“unpool” their interests from the BSM A-1 unit or well.  Rather, it informed the Hooks that the BSM
A-1 unit had been amended and the unit name changed.  After the BSM A-1 unit was amended,
reconstituted, and renamed the DuJay 1 unit, Samson paid, and the Hooks
accepted, royalty payments from pooled production from the DuJay 1 well.  Thereafter, the BSM A-1 well was produced as
a lease well and was not included in any unit.  Samson did not pay the Hooks royalties on the
BSM A-1 well.

          Subsequently,
Samson drilled another DuJay well (the “DuJay A-1 well”) and created a separate
pooling unit for that well.  The DuJay
A-1 unit differed from the DuJay 1 unit by depth limitation and acreage.  The DuJay A-1 well began producing on
September 25, 2002.  However, Samson did
not file the DuJay A-1 unit designation until July 2003.  The Hardin County Leases were likewise pooled
into the DuJay A-1 unit, and the Hooks accepted royalties on the production
from that unit.

          The
Hardin County Leases also contained a “most favored nation” clause.  This clause provided that, under certain
circumstances, the royalties payable to the Hooks must be elevated to match the
highest royalty payable to Samson’s other lessors.

3.    
Procedural History

In August
2004, several mineral-rights owners who had leased to Samson filed a suit against
Samson styled Joyce DuJay Lee v. Samson
Lone Star.  The plaintiffs, who did
not include the Hooks, complained about pooling issues unrelated to the BSM 1
well.  In December 2004, other
landowners, also not including the Hooks, filed a second action, styled Thomas Klorer et al. v. Samson, complaining
about the same issues.  In August 2005,
these two actions were consolidated.  

On his
birthday in November 2006, Charles Hooks, as an oil and gas attorney, attended
a seminar for oil and gas attorneys. 
There, he met an attorney who told him he was handling the Klorer and Lee cases against Samson.  

          On
November 16, 2006, the Hooks were added to the consolidated suit in a Fifth
Amended Petition.  This petition alleged
against Samson various breaches of contract and common law and statutory
negligence related to both the Hooks’ Jefferson County Lease and their two Hardin
County Leases.  Among other things, the Hooks claimed Samson had
improperly unpooled the BSM A-1 unit, and they sued to obtain all royalties
they would have received from that unit as if all the lessors, including Black
Stone Minerals, had agreed to pool, to be added to all royalties they received
from the DuJay 1 and DuJay A-1 units (the “unpooling claim”).  The
Hooks also asked for a declaratory judgment regarding the construction of the
“most favored nation” clauses in their Leases, which they argued was
triggered by the royalty paid to the State of Texas under a pooling agreement
with Samson that was higher than the royalty due to the Hooks.  Finally,
they sought the payment of royalties on “formation production” under the terms
of all three Leases.  The Hooks did not, however, plead any fraud
claims at that time.  

The Hooks added
their fraud, fraudulent inducement, and statutory fraud claims in a Sixth
Amended Petition, filed on May 7, 2007.  The
Hooks alleged in the alternative (1) that their Jefferson County Lease had
never been a part of the BSM 1 unit because no agreement to amend their lease
to allow pooling was entered, and, therefore, they were entitled to damages
under the Lease for the loss of their rights to require Samson either to drill
an offset well, pay them compensatory royalties, or release their acreage, and
(2) that Samson had made false representations as to the configuration of the BSM
1 unit and the location of the BSM 1 well to induce the Hooks to agree to amend
the Jefferson County Lease to allow a portion of it to be pooled in the BSM 1
well and unit (the “offset obligations claim”). 
They contended that Samson had represented “that the [BSM 1] (gas) well
was more than 1,320′ from the
nearest lease line of the Hooks Jefferson County Lease” so that its offset
obligations were not triggered under the Lease. 
The Hooks claimed that the representations were intended to save Samson
from having to pay them the substantially greater compensatory royalties that
would have been payable under the terms of the Lease for infringement of the 1,320-foot
buffer zone.  The Hooks contended
alternatively that, if their interests were pooled, they were entitled to
damages at least equal to the difference between the value they would have
received from Samson’s compliance with the terms of the Lease and the royalties
they actually received. 

In
September 2007, the trial court severed the consolidated action against Samson into
three different actions, one of which was the Hooks’ action against Samson for
fraud and breach of contract.[4] 

          Subsequently, the Hooks moved for partial summary judgment
on several of their claims based on the terms of their leases.  The Hooks moved for summary judgment on the
unpooling claim, claiming
that Samson did not have authority to vacate the BSM A-1 unit into which their
Hardin County Leases were pooled and that, therefore, Samson had breached its
lease contract by failing to pay them royalties on the BSM A-1 well.  The Hooks also moved for summary judgment on
their most-favored-nations claim, formation production claim, and offset
claims.  They argued that Samson failed
to pay them “royalties based on a greater ‘Most Favored Nations’ rate and
compensatory royalties on certain offset encroaching wells.” 

Samson moved for partial summary
judgment on the offset obligations provision, on the formation production
claims, and on the most favored nation claim. 
Samson also moved for summary judgment on the Hooks’ unpooling claim on
the basis of limitations.  

The trial court granted the Hooks’
motion and denied Samson’s motion on the unpooling claim.  It assessed damages of $766,626.85 against
Samson on the Hooks’ unpooling claim.  The
trial court also granted the Hooks’ summary judgment motion on their claim for
breach of the most favored nations clause in their Hardin County Leases and
awarded $848,854.01 in damages.

The trial
court granted Samson’s motion on the offset obligations provision and denied
the Hooks’ corresponding motions.  The
trial court also disposed of some other contract claims by other partial
summary judgment motions.  

In 2008, the
case went to trial solely on the Hooks’ fraud claims and the formation
production claims.  These included the
Hooks’ claims that Samson’s land man, Lanoue, had made misrepresentations to
them to get them to allow Samson to add their 50 acres subject to the Jefferson
County Lease to the BSM 1 pooling unit for the BSM 1 well, which was within the
1,320-foot buffer zone for the Lease. 
The Hooks contended Samson made these misrepresentations to avoid
abiding by the terms of Article VI(A) of the Jefferson County Lease, which
would have required Samson to drill an offset well, release their acreage, or
pay them compensatory royalties, and, therefore, they were entitled to damages.
 The Hooks also claimed that they were
entitled to additional royalties under the formation production clauses in their
Jefferson County and Hardin County Leases. 


The jury
answered “yes” to the questions of whether Samson committed fraud and statutory
fraud with respect to the Hooks’ claims regarding the BSM 1 well.  It assessed damages against Samson for fraud
in the amount of $20,081,638.07.  The
jury further found that Samson’s failure to pay royalties based on formation
production resulted in underpayment of royalties from the Hooks’ Leases.  The jury found that, in the exercise of
reasonable diligence, the Hooks should have discovered Samson’s fraud by
Charles “Hook’s Birthday April 2007.”  It
did not respond, however, to the questions asking for a finding, by clear and
convincing evidence, that the harm to the Hooks resulted from fraud or that Samson
had actual awareness of the falsity of the representation or promise that the
jury had found to be fraud.[5]  Therefore, it did not award exemplary
damages.  The jury also did not respond
to the question requesting it to “find beyond a reasonable doubt that Samson
secured execution by the Hooks of a document by deception” and that the
property had a value of $1,500 or more.[6]

Finally,
the jury found that Samson’s failure to pay royalties based on formation
production resulted in underpayment of royalties on all three of the Hooks’ Leases.

The trial
court entered final judgment on the jury’s verdict, awarding the Hooks
$20,081,638.07 for damages proximately caused by Samson’s fraud with respect to
the BSM 1 well.  The final judgment also
reaffirmed and incorporated the trial court’s previous summary judgment rulings
in favor of the Hooks.  In addition to
the fraud award, the judgment awarded the Hooks $766,626.85 in damages for the “unpooling” claim
related to BSM A-1 well, $848,854.01 in damages for breach of the Leases’ most
favored nations clause, and $52,257.22 in damages related to ad valorem taxes.  Finally, the final judgment included an award
of attorney’s fees and pre- and post-judgment interest in favor of the Hooks.

4.       Claims
on Appeal

Samson has
appealed the judgment on the trial verdict and the partial summary judgments entered
against it, and the Hooks have cross-appealed the partial summary judgments
entered against them, all of which were incorporated in the final judgment.  

          Samson
contends on appeal that the trial court erred in entering judgment on the
jury’s finding that it committed fraud with respect to the Hooks’ Jefferson
County Lease and that it withheld royalties on formation production with
respect to all three of the Hooks’ claims. 
It also contends that the trial court erred in granting the Hooks’
motion for summary judgment on their unpooling claim with respect to the BSM
A-1 well, in granting summary judgment on the Hooks’ claim for royalties under
the most favored nations clause in their Jefferson and Hardin County Leases,
and in denying its own motion for summary judgment on those claims.  Finally, Samson contends that the trial court
erred by granting a permanent injunction in its final judgment requiring Samson
to fulfill certain contract provisions on pain of contempt of court, that it
erred in awarding attorney’s fees to the Hooks, and that it erred in awarding
the Hooks 18% post-judgment interest compounded annually.

          The
Hooks contend on cross-appeal that the trial court erred in ruling in Samson’s
favor on their claims that Samson breached the “Offset Obligations” clause in
the Hardin County Leases.

B.  
DISCUSSION

1.     The Trial Court’s Judgment on the Hooks’ Fraud Claims
with Respect to the Jefferson County Lease

 

          In
its third issue, Samson contends (1) that there is legally and factually
insufficient evidence to support the jury’s finding that the Hooks could not
have discovered their fraud claims until April 2007 and (2) that the statute of
limitations bars the Hooks’ claim for fraud, fraudulent inducement, and statutory
fraud with respect to the Jefferson County Lease.

          To prove fraud, a plaintiff must show
that the defendant made (1) a material misrepresentation (2) that was either
known to be false when made or was asserted without knowledge of its truth (3)
which was intended to be relied upon (4) which was indeed relied upon and (5)
which caused injury.  Dow Chem. Co. v. Francis, 46 S.W.3d 237,
242 (Tex. 2001).  To prove fraudulent
inducement, these same elements of fraud must be established as they relate to
a contract.  Coastal Bank SSB v. Chase Bank of Tex., N.A., 135 S.W.3d 840, 843
(Tex. App.—Houston [1st Dist.] 2004, no pet.). 
The statute of limitations for fraud is four years.  Tex.
Civ. Prac. & Rem. Code Ann. §
16.004 (Vernon 2002).

“Statutes of limitations are
intended to compel plaintiffs to assert their claims ‘within a reasonable
period of time while the evidence is fresh in the minds of the parties and
witnesses.’”  Wagner & Brown, Ltd.
v. Horwood, 58 S.W.3d 732, 734 (Tex. 2001) (quoting Computer Assocs. Int’l,
Inc. v. Altai, Inc., 918 S.W.2d 453, 455 (Tex. 1996)).  “As a general rule, a cause of action accrues
and the statute of limitations begins to run when facts come into existence
that authorize a party to seek a judicial remedy.”  Provident Life & Accident Ins. Co. v.
Knott, 128 S.W.3d 211, 221 (Tex. 2003). 
In most circumstances, “a cause of action accrues when a wrongful act
causes a legal injury, regardless of when the plaintiff learns of that injury
or if all resulting damages have yet to occur.” 
Id.  However, the discovery
rule exception to the statute of limitations operates to defer accrual of a
cause of action until the plaintiff knew or, by exercising reasonable
diligence, should have known of the facts giving rise to the cause of action. Computer
Assocs., 918 S.W.2d at 455.  

The
application of the discovery rule is permitted only in instances in which “the
nature of the injury incurred is inherently undiscoverable and the evidence of
injury is objectively verifiable.”  BP Am. Prod. Co. v. Marshall, 342 S.W.3d
59, 65–66 (Tex. 2011); Computer Assocs.,
918 S.W.2d at 456.  “An injury is
inherently undiscoverable if it is, by its nature, unlikely to be discovered
within the prescribed limitations period despite due diligence.”  Wagner & Brown, 58 S.W.3d at
734–35; see Marshall, 342 S.W.3d at
66.  “The requirement of inherent
undiscoverability recognizes that the discovery rule exception should be
permitted only in circumstances where ‘it is difficult for the injured party to
learn of the negligent act or omission.’” 
Computer Assocs., 918 S.W.2d at 456 (quoting Willis v.
Maverick, 760 S.W.2d 642, 645 (Tex. 1988)). 
“Recognizing the social benefit in granting repose after a reasonable
time,” the Texas Supreme Court has “described the rule as a ‘very limited
exception to statutes of limitations.’”  Marshall, 342 S.W.3d at 66 (quoting Wagner
& Brown, 58 S.W.3d at 734).  

The
discovery rule “categorically does not apply to defer the accrual of royalty
owners’ claims for underpayments” or the accrual of claims arising from a lesseee’s
failure to continue good faith efforts to develop an oil and gas lease, because
royalty owners can timely discover such injuries through the exercise of due
diligence.  Marshall, 342 S.W.3d at 66; Wagner & Brown, 58 S.W.3d at
737.  Even when information that would
have revealed the injury is not available from public records, it may nevertheless
be “available from several other sources, including the lessee.”  Marshall,
342 S.W.3d at 66 (holding information disclosing lessee’s failure to continue good
faith efforts to develop oil and gas lease was available from same sources
recognized in HECI and Wagner
& Brown, including public records); see
HECI Exploration Co. v. Neel, 982
S.W.2d 881, 886 (Tex. 1998) (holding that, because several sources of
information about common reservoirs and operations are available to royalty
owners, including Railroad Commission records, discovery rule does not apply to
claims of royalty owners for damage to common oil and gas reservoir). 

The Hooks
claimed, and the jury found, that in making their determination to agree to the
pooling of 50 acres of their Jefferson County Lease in the BSM 1 unit, they
relied solely on Lanoue’s oral statement that the BSM 1 well was about 1,500
feet from their Lease line and on Charles Hooks’ interpretation of the plat of
the BSM 1 unit provided to him in response to his conversation with Lanoue on
February 15, 2001.  They also contended,
and the jury found, that they did not discover that the bottom hole of the BSM
1 well was within their 1,320-foot buffer zone, entitling them to additional
compensation royalties, until well within the limitations period as extended by
application of the discovery rule.[7]  Specifically, the Hooks claimed that they
relied on Charles Hooks’ interpretation of the designation “+ 1400′” on the line on the plat of the
redesignated unit drawn from an undesignated point to Pine Island Bayou as
meaning that the bottom hole of the BSM 1 well was about 1,400 feet, or more
than 1,320 feet, from their Lease, and, therefore, outside the buffer zone.  They did not inquire into seemingly
contradictory information in that document showing an arrow pointing to the
bottom hole of the BSM 1 well about one-quarter of the way along the 1,400-foot
line from an undesignated point to Pine Island Bayou, the western line of their
Jefferson County Lease.  Nor did they
inquire into the notation that the bottom hole was about 1,400 feet “FEL unit,”
i.e., from the eastern line of the reconfigured BSM 1 unit, which included 50
acres of their Jefferson County Lease. 
Both of these notations would indicate that the bottom hole of the BSM 1
well was clearly within the Lease’s 1,320-foot buffer zone.  

Although Charles
Hooks was an oil and gas attorney and had participated in more than 100 oil and
gas leases at the time of trial, and although he knew that Lanoue had certified
the plat furnished to Hooks as being made on his own knowledge in December
2000, the Hooks never sought to investigate the results of the directional
survey filed with the Railroad Commission in July 2000, which showed the exact
location of the bottom hole.  Nor did
they conduct due diligence in seeking the plat of the originally designated BSM
1 unit certified by the surveyor in March 2000, showing the proposed bottom
hole of the BSM 1 well, which was likewise filed with the Railroad Commission
in July 2000.  Both of these publicly
available documents would have shown that the well was proposed to be and was
bottomed within the 1,320-foot buffer zone of their Jefferson County Lease,
triggering Samson’s obligations to them under Article VI(A) of the Lease.  Any inquiry into the records available from
the lessee, Samson, or from the Railroad Commission would have shown the Hooks
the actual location of the BSM 1 well’s bottom hole in February 2001, when
pooling was first proposed to them.  The
Hooks’ fraud claims were not filed until May 2007, more than six years later.

We conclude
that, under Marshall, Wagner & Brown, and HECI, the nature of the Hooks’ injury
was not inherently undiscoverable.  The
discovery rule, therefore, does not apply to the Hooks’ fraud, fraudulent
inducement, and statutory fraud claims.  See Marshall, 342 S.W.3d at 65–66; Wagner & Brown, 58 S.W.3d at 737; HECI Exploration Co., 982 S.W.2d at 886.  We hold that those claims are barred by
limitations as a matter of law.

We sustain
Samson’s third issue. 

2.    
Summary
Judgments Entered Against Samson on the Hardin County Leases

 

(a) Samson’s “Unpooling” of the BSM A-1 Unit

In its sixth issue, Samson challenges the trial
court’s summary judgment awarding the Hooks damages on their claim for
royalties from the BSM A-1 unit due to Samson’s improper unpooling of that unit.  Samson contends that because Black Stone
Minerals, the 87.5% owner of the mineral rights on the drillsite tract
(FirnBank being the owner of 12.5%), did not consent to pooling, the “essential
purpose for forming that unit had failed” and the BSM A-1 unit as originally
designated was not formed.  Thus, the
amendment of the unit to exclude the non-consenting drillsite mineral owner,
Black Stone Minerals, was justified.  Samson
contends that after the BSM A-1 unit was amended and renamed the DuJay 1 unit,
the Hooks accepted royalty payments from production on both DuJay units, which
gave the Hooks a higher percentage of the production than they would have
received under the BSM A-1 unit.  Samson
argues that, by accepting these royalty payments, the Hooks accepted the
amendment to the BSM A-1 unit.  Alternatively,
it argues that if the amendment to the BSM A-1 unit was improper, the BSM A-1
unit still exists and the Hooks should have been paid in accordance with their
interests in that unit, not their interest in the two DuJay units, which were
improperly formed.  Finally, it argues
that, if the BSM A-1 unit still exists, the extent of the unit must be limited
to FirnBank’s 12.5% interest in the drillsite tract because only FirnBank
consented to pool its undivided interest in the gas produced from the BSM A-1
well.

An oil and gas lease is a contract and is therefore
interpreted as such.  Tittizer v. Union Gas Corp., 171 S.W.3d
857, 860 (Tex. 2005).   When construing a
contract, the primary goal of the courts is to give effect to the parties’
written expression of their intent.  PG&E Gas Transmission v. City of
Edinburg, 59 S.W.3d 225, 227 (Tex. App.—Corpus Christi 2001, no pet.).  The courts will enforce the intentions of the
parties to an unambiguous oil and gas lease as expressed in the lease.  Tittizer,
171 SW.3d at 860.  In determining the
agreement, the court examines all parts of the contract and the circumstances
surrounding its formulation.  Columbia Gas Transmission Corp. v. New Ulm
Gas, Ltd., 940 S.W.2d 587, 591 (Tex. 1996); PG&E Gas Transmission, 59 S.W.3d at 227–28.

Regulations of the Railroad Commission contain spacing
requirements that limit the number of oil and gas wells and locate them in particular
positions to maximize recovery.  Browning Oil Co.v. Luecke, 38 S.W.3d
625, 633 (Tex. App.—Austin 2000, pet. denied). 
These regulations prescribe minimum distances between a proposed well
and other wells drilled in the same area and between wells and property lines.  Id.
 Acreage is assigned to a well in
accordance in with spacing regulations to form a drilling unit before the well
may be drilled.  Id.  After the well is
drilled, density rules require the assignment of a specified number of acres to
the well so that the wells in a specific field may be drained efficiently.  Id.  Frequently, when a tract is too small to
satisfy state spacing or density requirements, lessees will pool acreage from
different leased tracts into a single unit. 
Id. at 634.  “Operations anywhere within the unit are
treated as if they occurred on all the land within the unit, and production
from a well on the pooled unit is treated as occurring on all the tracts pooled
into the unit.”  Id.

With respect to royalty interest owners, “pooling
results in ‘a cross-conveyance of interests in land by agreement among the
participating parties, each of whom obtains an undivided joint ownership in the
royalty earned from the land in the “block” created by the agreement’” and each
of whom receives royalty on the basis of the percentage of that party’s acreage
to the whole block.  Id. (quoting MCZ, Inc. v.
Triolo, 708 S.W.2d 49, 52–53 (Tex. App.—Houston [1st Dist.] 1986, writ
ref’d n.r.e.)).  In other words, pooling
effects a cross-conveyance among the owners of the minerals under the various
tracts in the pool so that all cotenants own undivided interests under the
unitized tract in the proportion that their contribution bears to the unitized
tract.  Montgomery v. Rittersbacher, 424 S.W.2d
210, 213 (Tex. 1968).  Thus, when an oil
and gas lease is executed by all of the owners of different mineral interests
in two or more tracts, the royalties payable under the lease will be pooled,
and all royalty interest owners in the land subject to the lease will share in
production, no matter where the well is drilled on the leasehold.  London
v. Merriman, 756 S.W.2d 736, 739 (Tex. App.—Corpus Christi 1988, writ
denied).  

An oil and gas
lessee has no power to pool, however, without the lessor’s express
authorization, usually contained in the lease’s pooling clause.  Tittizer, 171 S.W.3d at 860; Se. Pipe Line Co. v. Tichacek, 997
S.W.2d 166, 170 (Tex. 1999); Luecke,
38 S.W.3d at 634 (holding that lessee’s authority to pool is derived solely
from terms of lease, and lessee has no power to pool absent express
authority).  “For pooling to be valid, it
must be done in accordance with the terms of the methods and purposes specified
in the lease.”  Tittizer, 171 S.W.3d at 860; Tichacek,
997 S.W.2d at 170.  Good-faith pooling
can be exercised multiple times.  See Expando Prod. Co. v. Marshall, 407
S.W.2d 254, 259–60 (Tex. Civ. App.—Fort Worth 1966, writ ref’d n.r.e.).  However, “[t]he lessors’ land may be pooled
only to the extent stipulated in the lease.” 
Tittizer, 171 S.W.3d at 860
(quoting Jones v. Killingsworth, 403
S.W.2d 325, 327–28 (Tex. 1965)).

Joinder by all interest owners is not necessary for a
pooled unit to be valid.  See Ladd Petroleum Corp. v. Eagle Oil &
Gas Co., 695 S.W.2d 99, 106 (Tex. App.—Fort Worth 1985, writ ref’d n.r.e.);
see also Whelan v. Placid Oil Co.,
274 S.W.2d 125, 128 (Tex. Civ. App.—Texarkana 1954, writ ref’d n.r.e.) (holding
that tenant in common has right to execute lease on his undivided interest in
common property, notwithstanding nonjoinder of cotenant); Donnan v. Atl. Richfield, 732 S.W.2d 715, 717 (Tex. App.—Corpus
Christi 1987, no writ) (stating that cotenant has right to incorporate pooling
agreement into oil or gas lease without consent or joinder of cotenants,
thereby binding his undivided interest). 
Rather, a tenant in common has the legal right to incorporate a pooling
agreement into an original oil and gas lease without the consent or joinder of
the other cotenants, creating a valid contract binding the undivided interest
of the cotenant making the agreement.  Whelan, 274 S.W.2d at 128.  In such a case, the timely completion of a
producing well under the terms of the pooling agreement and within the unit
area set out in the unitization agreement will serve to continue the lease in
full force and effect so long as gas is being produced in commercial
quantities.  Id.  A cotenant who enters
into such a lease binding its royalty interest in the completed and producing
well and who accepts its pro rata share in the royalties from the well
calculated under the terms of the unitization agreement is estopped to deny the
validity of the unitization agreement as to its interest therein.  Id.
at 129. 

A lessee cannot unilaterally terminate a unit that has
a producing pooled well.  See Ladd Petroleum Corp., 695 S.W.2d at
106–07.  Rather, for a lessee to
terminate a unit, either the lessors must agree to the unpooling or the lease
must expressly authorize such termination. 
Id. at 107.  When a lease provides that a lessee may
dissolve a unit, once formed, if there is no “unitized substance” being
produced from the unit, the lessee may not dissolve a unit as long as a well is
still producing on it.  See Williamson v. Mobil Producing Tex. &
N.M., Inc., 737 S.W.2d 917, 921 (Tex. App.—Beaumont 1987, writ denied) (“So,
clearly, the lessee, if it is ‘after the discovery of the same,’ can change the
pooling unit only subsequent to the cessation of production. . . .”).

However, when
a mineral interest owner accepts royalty checks from a pooled unit, he has
accepted that unit.  See Montgomery, 424
S.W.2d at 214–15; Cambridge Prod. Inc. v.
Geodyne Nominee Corp., 292 S.W.3d 725, 732 (Tex. App.—Amarillo 2009, pet.
denied).  Moreover, under the doctrine of
equitable estoppel, a person or party may not maintain a position inconsistent
with one in which it acquiesced or from which it accepted a benefit.  Cole v.
Anadarko Petroleum Corp., 331 S.W.3d 30, 40 (Tex. App.—Eastland 2010, pet.
denied).  Similarly, under the doctrine
of quasi-estoppel, one may not accept the benefits of a transaction and then
adopt an inconsistent position to avoid corresponding effects, e.g., accepting
the benefits of an agreement and then arguing that the agreement is invalid.  Id.
at 41–42 (holding royalty owners were not equitably estopped to declare 1925
lease under which they had received royalty payments terminated, although they
continued to receive royalties under lease, when there was no evidence that
after declaring termination of lease they accepted lease payment or any other
benefit that accrued only because of continued viability of lease); cf. Cambridge Prod., 292 S.W.3d at 732
(holding that, under doctrine of equitable estoppel, mineral interest owners
could not repudiate unit designation after accepting royalties attributable to
unit).  Therefore, a previously
designated unit necessarily terminates upon the agreement of all the lessors to
participate in a new unit that is incompatible with the prior unit; and the
parties who have consented to a new unitization of the same interests are estopped
to deny the termination of the prior inconsistent unit designation.

Here, Samson argues that because the DuJay 1 unit’s
acreage conflicted with the earlier BSM A-1 unit the later DuJay 1 unit could
not have been formed and approved by regulatory authorities or accepted by the
Hooks if the BSM A-1 lease had still been in effect.  It contends that when the Hooks accepted
royalty checks measured according to their participation in the “amended unit,”
the DuJay 1 unit, they were consenting to their participation in the DuJay 1
unit.  Thus, the Hooks understood and
acknowledged by their acceptance of royalties from production from the DuJay 1
unit that the BSM A-1 unit was not formed. 
Samson further contends that, under the terms of the Hardin County
Leases (as well as under regulatory restrictions), the Hooks could not pool the
same acreage twice to the same depths.

The Hardin County Leases granted Samson the authority
to pool those leases with other land or leases. 
Under that authority, Samson obtained the Hooks’ agreement to pool their
interests with the undivided interests of the two drillsite lessors, Black
Stone Minerals and FirnBank, in the BSM A-1 unit.  One of the two drillsite lessors—FirnBank—consented to the BSM A-1 unit.  In addition, Samson pooled other lands and
its own working interests into that unit. 
However, Black Stone Minerals refused to pool.  Samson had no authority to pool Black Stone
Minerals’ interests without its express consent.  See Tittizer,
171 S.W.3d at 860; Tichacek, 997
S.W.2d at 170; Luecke, 38 S.W.3d at
634.  But it did not lack authority to
form a gas production unit that included the mineral interests of Black Stone
Minerals’s cotenant, FirnBank.  See Ladd Petroleum Corp., 695 S.W.2d at
106; Whelan, 274 S.W.2d at 128.

The Hooks argue that, under Whelan and Ladd Petroleum,
the BSM A-1 unit was validly formed when FirnBank, the owner of a 12.5%
undivided interest in the mineral rights to the drillsite, consented to the
unit and that this pooled unit could not be vacated or amended so long as gas
continued to be produced from the BSM A-1 well. 
The Hooks agreed to the pooling of their Hardin County Leases in the BSM
A-1 unit.  Therefore, they argue, they are
entitled to royalties from the BSM A-1 well. 


We agree with the Hooks that the originally designated
BSM A-1 unit was validly formed, creating a valid contract binding FirnBank, the
cotenant making the agreement, and the Hooks. 
See Whelan, 274 S.W.2d at 128.  However, FirnBank pooled only its own undivided
12.5% interest in the production from the unit. 
See id. at 129.  The unit that was created for the BSM A-1 well
did not include the interest of Black Stone Minerals, who had not consented to
pool its undivided mineral interest in the drillsite lease, as a lessor.  See
Tittizer, 171 S.W.3d at 860; Tichacek, 997 S.W.2d at 170; Luecke, 38 S.W.3d at 634.  Moreover, neither FirnBank nor the Hooks had
the authority to bind Black Stone Minerals to their own agreement to pool.  See
Montgomery, 424 S.W.2d at 213; Whelan,
274 S.W.2d at 128.

Recognizing these facts, Samson treated Black Stone
Minerals’ lease as continuing as an independent lease that was not pooled in
any unit, even though the Hardin County Leases and FirnBank’s undivided 12.5%
interest in the acreage of the designated unit, as well as the leases of the
other consenting landowners, did constitute a valid unit.  The completion of a producing well, the BSM
A-1, within the unit area set out in the unitization agreement served to
continue the leases granted to Samson by FirnBank, the Hooks, and the other
landowners in full force and effect so long as any “unitized substance”
continued to be produced from the BSM A-1 well, subject to unpooling through
agreement of the lessors, or through cessation of the production of unitized
substance as provided in the habendum clause of the Hardin County Leases.  See Ladd
Petroleum Corp., 695 S.W.2d at 107; Whelan,
274 S.W.2d at 128. 

When Black Stone Minerals refused to pool, however, Samson
was forced to look for other strata and acreage with which to pool in order to
unitize the field for production consistent with spacing and density
regulations.  It designated an “amended”
unit that included reduced acreage from the Black Stone Minerals/FirnBank lease
as well as the Hardin County Leases and others from the original BSM A-1 unit,
including the State’s leases.  The new unit
did not include the horizon from which the BSM A-1 well was producing, but it
did include deeper strata that had been included in the BSM A-1 unit, including
the depths from which the DuJay 1 well was producing.  Samson named this redesignated unit the DuJay
1 unit, and it subsequently designated a second new gas production unit that
conflicted with the original BSM A-1 unit, which it named the DuJay A-1
unit.  The DuJay A-1 unit included
different strata not included in the DuJay 1 unit.  Samson pooled the Hooks’ interests and those
of the other interest holders in the designated BSM A-1 unit into the DuJay 1
unit and the DuJay A-1 unit, pursuant to its right under the Hardin County
Leases to exercise pooling authority multiple times, “at any time and from time
to time . . . .”

Because the DuJay 1 and DuJay A-1 units conflicted
with the designated BSM A-1 unit, which had a producing well on it, that
previous unit could be terminated only by the agreement of the lessors—who had bound themselves to their
agreement to pool their leases in the BSM A-1 unit—to amend that unit and to accept the
subsequently designated conflicting units. See
Cambridge Prod., 292 S.W.3d at 732;
Ladd Petroleum Corp., 695 S.W.2d at 107. 
The Hooks expressly agreed to accept the terms of the new units, binding
themselves to accept royalties pursuant to their pro rata share of the
royalties from the DuJay 1 and DuJay A-1 units as calculated under the terms of
the DuJay 1 and DuJay A-1 unitization agreements, and they did accept royalties
from the production of both DuJay units. 
Those units conflicted with the designation of the same strata in the
earlier designated BSM A-1 unit.  By
accepting royalty checks from the newly designated, conflicting pooled units,
the Hooks accepted those units.  See Montgomery,
424 S.W.2d at 214–15; Cambridge Prod.,
292 S.W.3d at 732.  Their interest in the
BSM A-1 unit was, therefore, terminated, and they are estopped to deny the
validity of the unitization agreements for the DuJay 1 and DuJay A-1 units as
to their interest therein.  See Cambridge
Prod., 292 S.W.3d at 732; Ladd
Petroluem Corp., 695 S.W.2d at 107; Whelan,
274 S.W.2d at 129. 

This conclusion is consistent with the language of the
Hardin County Leases’ pooling clause itself, which states that “[t]he above
right and power to pool may be exercised at any time and from time to time and
before or after a well has been drilled, or while a well is being drilled.”  It is also consistent with both Whelan and Ladd Petroleum, relied upon by the Hooks.  

In Whelan, as
here, the owner of an undivided interest in minerals refused to execute a
pooling amendment and a unit declaration that included his tract in a
696.82-acre pooled unit.  See 274 S.W.2d at 128.  However, his cotenants executed both
documents.  See id. at 127.  The court
held that the co-owner’s lack of consent did not affect the validity of the
unit as between the consenting parties because “[t]he parties to the . . . unit
had the legal right to establish the original unit as containing 696.82
acres.”  Id. at 130.  

In Ladd
Petroleum, the pooling clause authorized pooling the Blair Lessors’
interests with “other lands, lease or leases.” 
695 S.W.2d at 106.  Two leases,
the Fulks lease and the Blair lease, were written covering the Blair tract and
the adjoining Woody tract.  Id. at 101.  In 1958, the then-lessee of the Fulks and
Blair leases and the lessee of a lease covering the Woody tract entered into a
pooling agreement for the production of gas and gas condensate.  Id.  Ladd subsequently succeeded to the leasehold
interests of the Fulks and Blair leases on the Blair tract and the Woody leases
on the Woody tract.  Id.  When the primary terms
of the Fulks and Blair leases expired, there was no production from any well on
the Blair tract, but there was production from a unit well located on the Woody
tract from which the Blair lessors received their pro rata share of
royalties.  Id.  In 1976, Ladd
inadvertently released all right, title and interest in its oil and gas
leasehold interests on the Woody tract.  Id. 
When it discovered its error, it finalized a new lease with the owner of
the Woody tract.  Id. at 102.  When the Blair
lessors discovered the release, they treated the unit as terminated and
demanded that Ladd release its leases on the Blair tract.  Id.  Ladd refused on the grounds that the unit was
not terminated by the release and renewal of the Woody lease, that there was
still production from the unit, and that development drilling was currently
occurring on the unit.  Id. 


The Fort Worth Court of Appeals held that, while
Ladd’s release of its leasehold interest in the Woody tract terminated one of
the two constituent leasehold interests in the 1958 pooling unit, it did not
terminate the unit.  The court interpreted
the leases, which authorized the lessee to pool the lessors’ leasehold
interest, but did not expressly authorize the lessee to terminate a pooling
agreement, as not vesting the power to unpool in the lessee.  Id.
at 106–07.  It held, “Therefore, an unpooling
could only come about through an agreement of the lessors, or through a
cessation of production as provided for in the habendum clauses.”  Id.
at 107.

Here, there was an agreement by the unitized lessors
who had accepted the BSM A-1 unit to accept the inconsistent DuJay 1 and DuJay
A-1 units, thereby terminating the BSM A-1 unit.  We hold that the Hooks are estopped by their
ratification of the DuJay 1 and DuJay A-1 units to assert an interest in royalties
from production from strata not included in those units, including production
from the BSM A-1 well. See Cambridge
Prods., 292 S.W.3d at 732. This holding is consistent with the purpose of
the pooling clauses in the Hardin County Leases, which is to assure the Hooks’
right to a proportionate share in the production of gas subject to drainage
from beneath the surface of their land, consistent with the similar rights of
others as defined by the regulatory provisions of the Railroad Commission.  

We sustain Samson’s sixth issue.

 

(b) The Hooks’ Summary Judgment on the “Most Favored
Nations” Clause in the Jefferson and Hardin County Leases

 

In its seventh issue, Samson claims
that the trial court erred in rendering summary judgment in the Hooks’ favor on
the “most favored nations” lease clause contained in all three of the Hooks’ Leases.  This clause provided that, under certain
circumstances, the royalties payable to the Hooks must be elevated to match the
highest royalty payable to Samson’s other lessors.  Specifically, the clause provides:

XXIX.         MOST FAVORED NATIONS CLAUSE

          If
Lessee shall enter into an oil and gas lease(s) part of which is located within
three (3) miles of any exterior boundary of the subject lands covered by the
Subject Lease, hereinafter referred to as “Third Party Lease,” Lessee shall
notify Lessor of such fact.  If the
reserved royalty or the amount per acre payable for delay rentals, shut-in
rentals or minimum royalty, at any time payable under such Third Party Lease,
is higher than the like royalty and amounts payable as provided in the Subject
Lease, the royalty or amount payable per acre in the Subject Lease, which is
less than that provided in the Third Party Lease shall be immediately increased
so that it will equal the royalty or other amounts payable under the Third
Party Lease.  The subject Lease and the
Third Party Lease must be calculated in substantially the same manner, such
that the comparison of the Subject Lease and the Third Party Lease is based on
the same effective net royalty or other payments, and that same shall include
or deduct the same types of charges, taxes and other burdens from such
interests.

 

The trial
court granted summary judgment in the Hooks’ favor, holding that this clause
was triggered by royalty paid to the State of Texas under a pooling agreement
with Samson that was higher than the royalty due to the Hooks.  

          It
is undisputed that the State of Texas’s lease under Pine Island Bayou (“State
of Texas Lease”) is a “Third Party Lease” within the meaning of that term in
the most favored nations clause in the Leases in that it covers land located
within three miles of the lands covered by the Hooks’ Leases.  The State, like FirnBank and the Hooks,
originally consented to pooling to form the BSM A-1 unit.  For that reason, it declined to consent to
the subsequent inconsistent DuJay 1 unit. 
In order to obtain the State’s consent to pool its lease under Pine
Island Bayou into the DuJay 1 unit, Samson entered into a pooling agreement wherein
Samson became obligated to pay the State a 28.28896% royalty on production, as
opposed to the 25% it had been paying the State and was paying to the Hooks.  The issue, therefore, is whether the pooling
agreement executed by Samson and the State constitutes a “Third Party Lease,” i.e.,
an oil and gas lease located within three miles of any exterior boundary of any
of the Hooks’ Leases with a higher royalty than that provided for in the Hooks’
Leases, so that Samson’s obligation to pay the Hooks increased royalties under
the most favored nations clause in those leases was triggered.

          A
most favored nations clause is “a vendor protection clause [that] enables the
vendor to receive the benefit of increases in the market price of his product
over the term of a long range contract with a purchaser.”  Lone
Star Gas Co. v. Howard Corp., 556 S.W.2d 372, 374 (Tex. Civ. App.—Texarkana
1977, writ ref’d n.r.e.).  Such a clause
is enforced according to its terms.  See id. at 375–76.  

          The
most favored nations clause in the Leases referred specifically to Samson’s
obligation to pay the Hooks royalty per acre equal to that payable under any
Third Party “oil and gas lease(s)
part of which is located within three (3) miles of any exterior boundary of the
subject lands covered by [the Hooks’] Lease that Samson entered.”  (Emphasis added.)  Here, however, Samson did not enter an “oil
and gas lease” with the State that required it to pay higher royalties per acre
than it was paying the Hooks under their Leases.  It entered a settlement agreement, called a
“Pooling Agreement,” that raised only the royalty payable to the State on production
from the DuJay 1 unit.  

          The
difference between the royalties payable to the State on production from the
DuJay 1 unit and the royalties paid to the Hooks did not represent a difference
in the market price of gas at the time the pooling agreement was entered; nor
did it represent a general increase in the royalty rate on the State’s
leases.  It was an amount agreed upon by
Samson and the State to induce it to accept the amended unit in place of the
BSM A-1 unit and to compensate the State for its loss of royalties from the BSM
A-1 well due to Samson’s designation of the DuJay 1 unit in conflict with the
BSM A-1 unit.  The Hooks recognized that
the higher royalties paid to the State under the settlement agreement were not
due to a change in the value of gas production from the BSM A-1 well or a
generally higher royalty rate for the State that disadvantaged the Hooks, as
evidenced by the fact that, after the Hooks both accepted royalties from the
DuJay 1 and the DuJay A-1 units and were awarded a higher royalty rate and
other damages under the most favored nations clause,[8]
they continued to seek additional damages in the form of royalties from the BSM
A-1 well.   

          We
conclude that, under its plain terms, the most favored nations clause in the Hooks’
Leases does not apply to trigger royalties payable to the Hooks equal to those
payable under the settlement agreement reached between Samson and the State.  Therefore, we hold that the trial court erred
in granting the Hooks’ motion for summary judgment for damages under the most
favored nations clause in the Hardin County Leases.

We sustain Samson’s seventh issue.

3.    
The Hooks’ Claims Under the Formation Production
Clause in the Jefferson and Hardin County Leases

 

In its fifth issue, Samson complains
about the jury’s finding in response to Question Number 8 that Samson’s failure
to pay royalty based on formation production resulted in underpayment of
royalty under the Hooks’ Jefferson and Hardin County Leases.  Samson contends the issue was erroneously
submitted to the jury because the construction of the contractual provision
involved was a question of law for the trial court; therefore, the jury’s
response to Question Number 8 is immaterial. 
The Hooks claimed that Samson improperly failed to pay on formation
production under their leases.  The trial
court submitted this question to the jury. 
Samson argues that, as a matter of law, the lease provision in question
does not require Samson to pay for formation production, as this would require
it to pay twice for molecules of gas produced at the surface of the well as liquid
condensate.  It also contends that there
is legally and factually insufficient evidence that the Hooks’ Leases required
Samson to pay to pay twice for those molecules of gas.  It states that by giving effect to the jury’s
answer to Question Number 8 the trial court increased all the other categories
of damages assessed against it.

Condensate consists of “hydrocarbons that exist in the
form of gas when contained in the natural gas reservoir underground, which
condense into liquid form when released from the reservoir’s higher pressure
and temperature.”  Bowden v. Phillips Petroleum Co., 247 S.W.3d 690, 704 n.7 (Tex.
2008).  When gas is produced, it goes
through a mechanical separator through which condensate drops out as a liquid
at the wellhead.  The Railroad Commission
has implemented a system by which producers report the amount of gas in the
reservoir before it is produced.  This
system requires producers to use a formula to calculate the volume of reservoir
gas produced at the surface as a liquid. 
“Formation production” is thus the calculation of the total amount of
natural gas taken from the reservoir in whatever form it arrived at the
surface, whether in the form of gas or in the form of liquid condensate.  Formation production calculations allow the
Railroad Commission to track the amount of gas coming out of the ground to
avoid overproduction. 

Article III of each of the Hooks’ Leases contains
several paragraphs specifying how royalties were to be paid.  It reads in pertinent part:

III      ROYALTIES:

 

Lessors reserve for themselves . . .
the following royalties . . .

 

. . . .

 

B. (1)
On gas, including casinghead gas or other gaseous substances produced from said
land, Twenty-Five percent (25%) of the market value at the wells of such
gas, or Twenty-Five percent (25%) of the price received therefor by
Lessee, which ever is greater . . .

C.   An equal Twenty-Five percent
(25%) part of all other liquid hydrocarbons that may be produced from said land
. . .

          . . . .

 

K. For
the purposes of calculating all royalties payable under Article III herein, it
is expressly provided that all such calculations shall be based on formation
production as reported on Texas Railroad Commission forms P-1 and P-2.

The Hooks base their formation production argument on Article
III(K).  They contend that although this
provision expressly refers to the entire Article III, which covers payments for
both liquids and gas, it requires that all calculations shall be based on gas
as it exists in the reservoir so that royalties must be paid on liquid
condensate both as it is produced in liquid form and as it exists in gaseous
form in the reservoir. 

The interpretation of the formation production provision
in the Hooks’ Leases is a matter of contract construction.  Whether a contract is ambiguous is a question
of law for the court.  J.M. Davidson, Inc. v. Webster, 128
S.W.3d 223, 229 (Tex. 2003).  We construe
the parties’ intentions as expressed in the document, considering the entire
writing and attempting to harmonize and give effect to all of the contract’s
provisions with reference to the whole agreement.  Frost
Nat’l Bank v. L & F Distribs., 165 S.W.3d 310, 311–12 (Tex. 2005).  “We construe contracts ‘from a utilitarian
standpoint bearing in mind the particular business activity sought to be
served’ and ‘will avoid when possible and proper a construction which is
unreasonable, inequitable, and oppressive.’” 
Id.; accord Ace Ins. Co. v. Zurich Am. Ins. Co., 59 S.W.3d 424, 428
(Tex. App.—Houston [1st Dist.] 2001, pet. denied).  If, after the rules of construction are
applied, the contract can be given a definite or certain legal meaning, it is
unambiguous and we construe it as a matter of law.  Frost
Nat’l Bank, 165 S.W.3d at 312.

          Article III of the Hooks’ Leases,
governing the payment of royalties, addresses a number of royalty payment
issues.  In each case, it unambiguously
states that Samson will pay 25% of the proceeds it receives, whether for gas or
for liquids, as royalties to the Hooks unless the proceeds are below market
value, in which case it must pay 25% of market value.  In no place do the Leases state that, having
paid royalties to the Hooks from the proceeds it receives on the sale of gas or
liquid condensate, Samson must pay for the condensate a second time as it
existed as gas in the reservoir.  Article
III does not state that Samson must pay a 25% royalty on “formation production”
in addition to royalty on gas and liquids as produced, and we decline to read
that provision into the unambiguous language of the Lease.  See
Mann Frankfort Stein & Lipp Advisors Inc. v. Fielding, 289 S.W.3d 844,
850 (Tex. 2009) (“[T]erms are to be implied in contract, not because they are
reasonable, but because they are necessarily involved in the contractual
relationship, such that the parties must have intended them and must have
failed to express them only because of sheer inadvertence or because they are
too obvious to need expression.”).  We
agree with Samson that the unambiguous meaning of these lease provisions is
that the Hooks are entitled to a 25% royalty on all gas and liquid
hydrocarbons.   

          We hold that, under its plain
language, the formation production clause in Article III(K) of the Hooks’ Jefferson
County and Hardin County Leases does not operate to double the amount of
royalties owed on the liquid condensate produced from the well.   Therefore, the trial court erred in awarding
the Hooks damages calculated under the formation production clause in their
Leases.

          We
sustain Samson’s fifth issue. 

4.     The Trial Court’s Grant of a Permanent Injunction

          In
its eighth issue, Samson claims that the trial court erred by granting a
permanent injunction in its judgment that requires it to fulfill certain contract
provisions upon pain of contempt of court. 
Samson claims that no evidence was presented of the necessary elements
for a permanent injunction.  

The first item of injunctive relief requires Samson to
pay the Hooks royalty on production from the BSM A-1 well commencing with
production after May 2008.  The fourth
item states that Samson shall be liable for all ad valorem taxes on the Hooks’
interests in the oil and gas leases at issue after November 2007, as long as
those leases are in effect. The fifth item requires Samson to provide the Hooks
with certain notices and information “as required by the oil and gas leases in
this case while those leases are in effect.”

A permanent injunction is proper only when there is
evidence of four elements: (1) a wrongful act; (2) imminent harm; (3)
irreparable injury, and (4) no adequate remedy at law.  Jordon
v. Landry’s Seafood Rest., Inc., 89 S.W.3d 737, 742 (Tex. App.—Houston [1st
Dist.] 2002, pet. denied).  The ruling is
reviewed for an abuse of discretion.  Id. 
Courts do not enforce contractual rights by permanent injunction unless
the complaining party can show an inadequate remedy at law and irreparable
injury.  Cytogenix, Inc. v. Waldroff, 213 S.W.3d 479, 487 (Tex. App.—Houston
[1st Dist.] 2006, pet. denied).  Moreover,
in order to grant specific performance of a contract via an injunction, present
performance of the contract’s terms must be possible.  Id.  “A court should not decree future
contractual performance by requiring a party to perform a continuous series of
acts, extending through a long period of time, over which the court exercises
its supervision.”  Id.  Unless a “significant
public interest” is involved, parties to a contract are “left to their remedies
at law.”  Id.

The Hooks have failed to cite to us any evidence showing
that they are in danger of imminent harm or irreparable injury from Samson’s
failure to pay them royalties on production from the BSM A-1 well or ad valorem
taxes, or lease notices and information. 
Nor have they shown that they have no adequate remedy at law for their
grievances.  Moreover, at least three of
the items of injunctive relief decree future contractual performance, which is
forbidden by Cytogenix.  Id.  Accordingly, we conclude that the trial court
abused its discretion by including injunctive relief in its order (1) in the
absence of any evidence of the elements of a permanent injunction and (2) when
the injunctive relief decrees future contractual performance.

We sustain Samson’s fifth issue.[9]

C. CONCLUSION

 

We reverse the trial court’s final judgment awarding the Hooks damages on their fraud, fraudulent
inducement, statutory fraud, and formation production claims and render
judgment that the Hooks take nothing by these claims.  We likewise reverse the trial court’s final
judgment as it reaffirms and incorporates its summary judgments on the Hooks’
unpooling and most favored nations claims, and render judgment that the Hooks
take nothing by these claims.  Because of
our holding on these issues, we vacate the trial court’s award of attorney’s
fees and post-judgment interest. 
Finally, we vacate the permanent injunction entered against Samson by
the trial court.

II.   The Hooks’ Cross-Appeal

 

          Before trial, the Hooks and Samson filed cross-motions for
summary judgment on the issue of whether Samson breached the offset obligations
in the Hardin County Leases.  The trial
court granted Samson’s motion and denied the Hooks’ motion on this issue
without stating its reasons.  

          The Hooks filed a cross-appeal claiming, in one issue, that
the trial court erred in granting Samson’s motion for summary judgment and
denying their own.  The Hooks include in
this issue sub-issues regarding the correct interpretation of Samson’s offset
obligations under the Jefferson County and Hardin County Leases, an exception
in the Leases for pre-existing wells, and the statute of limitations.  

          Samson contends that the Hooks have waived their appeal of
the summary judgments by failing to preserve it.  It further argues that the trial court
correctly interpreted the Hardin County Leases with respect to the issues
raised by the Hooks on cross-appeal and correctly rendered summary judgment
holding that the Hooks’ offset claims are contract claims that are barred by
limitations. 

A.  
Standard of Review

          To
prevail on a summary judgment motion, a movant has the burden of proving that
it is entitled to judgment as a matter of law and that there is no genuine
issue of material fact.  Tex. R. Civ. P. 166a(c); Cathey v. Booth, 900 S.W.2d 339, 341
(Tex. 1995).  Neither party herein argues
that a genuine issue of material fact exists which precludes summary judgment; instead,
both claim that, as a matter of law, they are entitled to summary judgment
based on the language of the Leases.

B.  
Statute of Limitations

The Hooks’
claims that Samson breached its offset obligations are breach of contract
claims.  The four-year statute of
limitations applies to the Hooks’ contract claims.  See
Stine v. Stewart, 80 S.W.3d 586, 592 (Tex. 2002); HECI Exploration Co., 982 S.W.2d at 885.  “It is well-settled law that a breach of
contract claim accrues when the contract is breached.”  Stine,
80 S.W.3d at 592.  

Here,
Samson’s breach of its offset obligations occurred ninety days from the date of
first production from the wells in question. 
For the BSM 1 well, the ninety days ran in January 2001.  For the BSM A-1 well, the ninety days ran in
September of 2001.  The Hooks did not
file suit until November of 2006, more than five years later.    

We conclude
that the Hooks’ cause of action for Samson’s breach of its offset obligations
was barred by the four-year statute of limitations.

Because our
resolution of this issue is dispositive, we do not reach the other sub-issues
raised in the Hooks’ cross-appeal.[10]

We overrule
the Hooks’ issue on cross-appeal.




 

III.          
CONCLUSION

We reverse the final judgment of the trial court
against Samson and hold that the Hooks take nothing by their claims, and we
vacate the permanent injunction entered against Samson.

 

 

 

                                                                   Evelyn
V. Keyes

                                                                   Justice


 

Panel consists of Justices Keyes, Sharp, and
Massengale.

Justice Sharp, concurring in part and
dissenting in part.











[1]
          Originally appealed to the Ninth
Court of Appeals, this case was transferred to this Court by the Texas Supreme
Court pursuant to its docket equalization efforts.  See Tex. Gov’t Code Ann. § 73.001 (Vernon
2005).





[2]           This issue was added at Samson’s
request by order dated June 10, 2010, and both parties were required to and did
file supplemental briefs thereon.





[3]           Article
VI(A) of the Jefferson County Lease provided, in pertinent part, as follows: 

 

[I]n the event a well producing
from a unit not comprised of acreage from the leased premises . . . which has
been classified as “gas” . . . is completed on adjacent or
nearby lands not more than one thousand three hundred and twenty feet (1,320’)
from the leased premises, or draining the leased premises, Lessee covenants and
agrees to, within ninety (90) days from the date production is first sold,
removed or otherwise marketed from said adjacent or nearby producing well,
either (1) commence with due diligence operations for the actual drilling of an
offset well on the leased premises to the base of the formation from which the
adjacent or nearby producing well is producing, (2) pay Lessors as compensatory
royalty, in addition to any royalties currently due, a sum equal to the
royalties which would be payable under this lease on the production from said
adjacent or nearby producing well had same been producing on the leased
premises, or (3) in lieu of drilling such offset well or paying such
compensatory royalty, release by recordable instrument the offset acreage, as
hereinafter defined.  “Offset Acreage,”
as used hereinabove, shall be defined as a unit which would surround such a
well if same were completed on the leased premises; provided, however, that if
any portion of the offset acreage would be included in a producing unit
designated by Lessee hereunder, then if Lessee elects to surrender and release
such offset acreage, it may retain and except from such release the producing
stratum or strata included in such producing unit, but such offset acreage must
conform to the depth, size and shape limitations contained in Paragraph V.
herein.  The provisions hereof shall
apply regardless of whether lands upon which offset wells may be located are
owned by Lessor or any of them or not, and with regard to wells located within
the hereinabove prescribed distances from the leased premises, regardless of
whether drainage is actually proved to be taking place or not.  Notwithstanding anything herein to the
contrary, Lessee shall have no obligations under this Article VI in the event a
producing well on nearby or adjacent land is already offset by a well on the
leased premises or on acreage pooled therewith producing from the same
producing horizon from which production has been secured from any well on
nearby or adjacent lands.

 





[4]
          The severed lawsuits are Klorer v. Samson Lone Star, No.
B-173,008; Bordages v. Samson Lone Star,
No. B-173,008-A; and Hooks v. Samson Lone
Star, No. B-173,008-B.  Only Hooks has gone to trial.  Klorer
and Bordages remain pending.





[5]
          Question Four, the question
asking for a finding that the harm to the Hooks resulted from fraud, and
Question Five, asking for a finding that Samson had actual awareness of the
falsity of the representation, instructed the jury to answer the questions only
if it unanimously answered “yes” to Questions One and Two.  Only eleven of the twelve jurors answered
“yes” to Questions One and Two; therefore, the jury properly refrained from
answering Questions Four and Five.

 





[6]
          Question Seven, seeking a
finding that Samson secured execution of a document by deception, instructed
the jury to answer the question only if it unanimously answered “yes” to
Question Four or Five.  Because the jury
did not answer Question Four or Five, it properly refrained from answering
Question Seven.





[7]           Although
the jury found that the Hooks’ cause of action for fraud accrued on “Hooks’
birthday April 2007,” the record shows that Hooks’ birthday was in November and
that it was on his birthday in November 2006 that he attended the seminar for
oil and gas attorneys where he first heard about the other mineral-rights
owners’ suits against Samson.





[8]           The
summary judgment on the Hooks’ most favored nations claim included damages
under the Hooks’ formation production claim and a large sum for “late charges.”






[9]
          In its eighth issue, Samson complains about the grant of attorney’s
fees in the final judgment.  The parties
stipulated that the Hooks’ right to collect
attorney’s fees was contingent on the Hooks’ prevailing at trial and on appeal.
 Additionally, in two sentences in its appellate brief, Samson claimed that “[i]t was
error to award postjudgment interest of 18% compounded annually.  Instead, the postjudgment interest should be
at the same rate as a proper prejudgment interest rate.”  We asked for and received supplemental
briefing from both parties on this issue. 
The supplemental issue, as phrased by Samson, is as follows: “Should the
postjudgment interest rate be 5% as set by Texas Finance Code § 304.003, rather than the rate of 18% as stated in
the Final Judgment?”  Because we have
reversed the judgment in favor of the Hooks so that they are not prevailing
parties, upon which their right to attorney’s fees and post-judgment interest
are both contingent, we do not reach these issues.





[10]         Likewise, we do not reach Samson’s claims of waiver.